132 F.3d 504
 Bankr. L. Rep. P 77,588, 48 Fed. R. Evid. Serv. 524,
97 Cal. Daily Op. Serv. 9549,
97 Daily Journal D.A.R. 15,303
UNITED STATES of America, Plaintiff-Appellee,
v.
Leonhard BAUER, Defendant-Appellant.
 No. 97-10046.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Nov. 6, 1997.
Decided Dec. 22, 1997.
 
 Amitai Schwartz and Dennis M. Farias, San Francisco, CA, for Defendant-Appellant.
 Andrew M. Scoble, Assistant United States Attorney, San Francisco, CA, for Plaintiff-Appellee.
 Appeal from the United States District Court for the Northern District of California; D. Lowell Jensen, District Judge, Presiding. D.C. No. CR-95-40179-DLJ.
 Before: CHOY, GOODWIN, and T.G. NELSON, Circuit Judges.
 T.G. NELSON, Circuit Judge:
 
 
 1
 Leonhard Bauer ("Bauer") appeals his conviction for making false statements on his bankruptcy petition in violation of 18 U.S.C. § 152(3) and omitting certain assets from his bankruptcy petition in violation of 18 U.S.C. § 152(7). Because we conclude that Bauer's attorney-client privilege was violated when the district court allowed Bauer's bankruptcy attorney to testify against him at his criminal trial, and this error was not harmless, we reverse Bauer's conviction.
 
 FACTS
 
 2
 On October 11, 1990, Bauer filed for Chapter 11 bankruptcy, listing assets of $532,000.00 and liabilities of $960,588.00. At the time, Bauer was represented by an attorney, Kenneth N. Rivera ("Rivera"), whom he consulted approximately twelve times. In April 1991, a trustee was appointed and the case was converted to Chapter 7 bankruptcy in October 1991. On November 2, 1994, all of Bauer's dischargeable debts were discharged and the case was closed on January 17, 1995.
 
 
 3
 In 1992, following the trustee's discovery that several of Bauer's assets had not been reported and that other assets had been transferred within one year of Bauer's filing of his bankruptcy petition, the case was referred to the FBI for criminal investigation. The investigation revealed that Bauer had transferred several assets belonging to the estate within one year of the bankruptcy petition, forming the basis for the concealment charge. On September 24, 1990, Bauer transferred ownership of his 1977 Dodge van to his daughter Suzanne. On October 9, 1990, Bauer transferred his lease interest in a 1978 Cadillac to his other daughter Angelique. On September 26, 1990, Bauer transferred ownership of a life insurance policy to his wife Sieglinde, after having requested the maximum available loan on the policy on September 22, 1990, and having deposited the proceeds in a bank account in the name of Bauer's grandson. There was evidence that loan proceeds from other life insurance policies were handled in the same manner.
 
 
 4
 The investigation also revealed the existence of several assets that Bauer did not include in his bankruptcy petition. In 1992, Bauer filed a theft-loss claim with State Farm, his insurance company, listing personal property valued at approximately $22,000.00 that was allegedly stolen during separate thefts in 1992. Items contained on the inventory forms submitted by Bauer for which he listed a pre-bankruptcy petition acquisition date, but which had not been reported in the bankruptcy petition, included a handgun and several items of gold jewelry. The value of these assets, as alleged by Bauer in the inventory forms, totaled $21,249.00. There was also evidence that Bauer possessed a substantial collection of firearms which was not reported in the bankruptcy petition. Finally, Bauer owned a Rolex watch, valued at $11,050.00, which he admitted failing to disclose in his bankruptcy petition, explaining that he did so because he was still making payments.
 
 
 5
 On October 5, 1995, a grand jury returned an indictment against Bauer, charging him with concealing assets in violation of 18 U.S.C. § 152(7) and making false statements in his bankruptcy petition in violation of 18 U.S.C. § 152(3). On June 24, 1996, Bauer's jury trial began.
 
 
 6
 The case boiled down to a dispute over Bauer's intent. As its final witness, the Government called Rivera, Bauer's bankruptcy attorney, to testify. Over both Bauer's pretrial and at-trial objections, Rivera testified on direct examination by the Government as follows:
 
 
 7
 Q. Now, again, without asking about the contents of any privileged communications that you may have had with Mr. Bauer, did you advise him prior to filing his petition-prior to his filing the petition that generally there is a duty to disclose all property, something to that effect?
 
 
 8
 A. Well, I gave him a document which we reviewed, and in the review of the document-
 
 
 9
 ....
 
 
 10
 In the review of the document, we went through a disclosure of the--of his estates, which included all property that he told me he had.
 
 
 11
 Q. Okay. And as part of that process prior to filing his bankruptcy, did you advise him in one form or another-I'm not asking for exact words-of the fact that a bankruptcy petition and its attachments is filed under penalty of perjury, that it's sworn?
 
 
 12
 A. I think we covered that they were signed under penalty of perjury.
 
 
 13
 On July 2, 1996, the jury found Bauer guilty on both counts. On January 15, 1997, after making a three-level downward departure based upon Bauer's extraordinary physical impairments, the district court sentenced Bauer to one year in prison, three years of post-prison supervised release, and ordered restitution in the amount of $84,967.51, plus additional restitution (for the Rolex watch) in the amount of $3,418.13. This timely appeal followed.[1]
 
 DISCUSSION
 
 14
 We must first determine whether Rivera's statements to Bauer concerning Bauer's duty to disclose all property in his bankruptcy petition and the perjury implications of falsifying a bankruptcy petition are in fact covered by the attorney-client privilege. A party asserting the attorney-client privilege has the burden of establishing the relationship and the privileged nature of the communication. Ralls v. United States, 52 F.3d 223, 225 (9th Cir.1995). Whether the party has met these requirements is reviewed de novo. Id. We also review the district court's rulings on the scope of the attorney-client privilege de novo. United States v. Blackman, 72 F.3d 1418, 1423 (9th Cir.1995), cert. denied, --- U.S. ----, 117 S.Ct. 275, 136 L.Ed.2d 198 (1996). We view the district court's conclusion that Rivera's communication to Bauer is not protected by the attorney-client privilege as "a mixed question of law and fact which this court reviews independently and without deference to the district court." United States v. Gray, 876 F.2d 1411, 1415 (9th Cir.1989).
 
 
 15
 Although the Government offers several alternative grounds to support its argument that Rivera's statements are not covered by the attorney-client privilege, it is appropriate to begin with the ground on which the district court relied. In ruling that the statements were admissible, the district court stated that "it's not within the attorney-client privilege when the attorney gives advice to that effect in that the attorney's acting as an officer of the court and not as attorney-client."[2] After some discussion with Bauer's trial counsel, the district court concluded: "I believe that-notwithstanding the grounds that are stated, Mr. Martinez, I think that this does fall within the notion that it's the attorney simply advising the client of the rules of court that apply to the proceeding that's involved, and so I think it's admissible." This ruling was incorrect.
 
 
 16
 At the outset, it is important to recognize that the attorney-client privilege is a two-way street: "The attorney-client privilege protects confidential disclosures made by a client to an attorney in order to obtain legal advice, ... as well as an attorney's advice in response to such disclosures." United States v. Chen, 99 F.3d 1495, 1501 (9th Cir.1996) (emphasis added) (quotation omitted) (addressing a claim concerning the crime-fraud exception to the attorney-client privilege), cert. denied, --- U.S. ----, 117 S.Ct. 1429, 137 L.Ed.2d 538 (1997). There is no dispute in this case that Rivera's testimony disclosed statements of the law that he made to Bauer in the course of representing him in the preparation and filing of his bankruptcy petition.
 
 
 17
 In support of the district court's ruling, the Government relies on three Ninth Circuit cases, all of which are distinguishable from the circumstances present in this case. We discuss each case in turn.
 
 
 18
 In United States v. Freeman, 519 F.2d 67 (9th Cir.1975), we held that the attorney-client privilege does not cover an attorney's statement to a client regarding the date on which the district court ordered the client to appear for sentencing, where the client was charged with bail jumping (18 U.S.C. § 3150) and alleged that she did not know the date of her sentencing hearing. Quoting the Second Circuit, we explained:
 
 
 19
 The relaying of this message is not in the nature of a confidential communication. Defense counsel served merely as a conduit for transmission of a message. ... Defendant's counsel had a duty to relay the instructions to his client in his capacity as an officer of the court, and this in no way was inconsistent with his obligation to his client.
 
 
 20
 Id. at 68 (emphasis added) (quoting United States v. Hall, 346 F.2d 875, 882 (2d Cir.1965)). We therefore held that "[t]he evidence sought to be elicited from [the attorney] was not of a confidential nature and hence was not protected by the attorney-client privilege. It simply related to whether he had advised his client of the court's order to appear." Id.
 
 
 21
 In United States v. Gray, 876 F.2d 1411 (9th Cir.1989), we were faced with virtually an identical situation, where the defendant argued that the district court should not have allowed his attorney to testify that he informed the defendant of his sentencing date. After noting that "information concerning a defendant's obligation to appear for sentencing" does not qualify as confidential information, we held that "[a]n attorney's testimony regarding the fact that the client was informed of the hearing date 'simply relate[s] to whether [the attorney] advised his client of the court's order to appear.' " Id. at 1415 (quoting Freeman, 519 F.2d at 68).
 
 
 22
 In McKay v. Commissioner, 886 F.2d 1237 (9th Cir.1989), the final case relied on by the Government, a delinquent taxpayer claimed that he had not received notice from the IRS that his previous tax returns were deficient. The Government called the taxpayer's attorney to testify that he gave the taxpayer a copy of the deficiency notice from the IRS in ample time to file a timely petition for review in the tax court. We held that such delivery of notice was not protected by the attorney-client privilege, stating:
 
 
 23
 [The attorney] testified only that he had conveyed information from the government to his client. This case is analogous to those holding that an attorney may be required to testify in a prosecution for "bail jumping," 18 U.S.C. § 3150, that he had informed his client of the date of the hearing at which the defendant failed to appear.
 
 
 24
 Id. at 1238 (citing Freeman, 519 F.2d at 68).
 
 
 25
 These cases are simply not analogous to the circumstances present in Bauer's case. All three cases evoke an image of "attorney as messenger," wherein the contents of a message that otherwise amounts to public information is not protected by the attorney-client privilege. The conveyance of public information from an attorney to his client, such as the date of a hearing, sentencing, or trial, is not covered by the privilege because there is nothing confidential about the communication. The only issue in those cases involving the conveyance of such information is notice. When notice of a hearing date or a letter of tax delinquency is relevant to the proceeding, and the attorney is the party responsible as an officer of the court for conveying that notice to the client, the communication of that notice does not fall within the scope of the attorney-client privilege.
 
 
 26
 The situation in Bauer's case is vastly different. Rather than merely passing along public legal information in furtherance of his obligation as an officer of the court, Rivera actually delivered legal advice to Bauer in the course of the preparation of Bauer's bankruptcy petition. The mere fact that Rivera might tell all of his clients to disclose all of their assets and avoid lying on their bankruptcy petitions does not alter the advisory nature of the counsel given in completing that process. While it is certainly true that not all communications between attorney and client are privileged, including such information as the identity of the client, the amount of the fee, the identification of payment by case file name, the general purpose of the work performed, and whether an attorney coached a client on his testimony, see, e.g., United States v. Carrillo, 16 F.3d 1046, 1050 (9th Cir.1994); Clarke v. American Commerce Nat'l Bank, 974 F.2d 127, 129 (9th Cir.1992), no reasonable interpretation of Rivera's communications with Bauer regarding the legal obligations involved in filing a bankruptcy petition would characterize them as anything other than legal advice. As legal advice, given to Bauer within the scope of the attorney-client relationship, those statements were protected by the attorney-client privilege.
 
 
 27
 The Government offers two alternative grounds to support the proposition that the targeted statements fall outside the protection of the privilege. After careful consideration of both arguments, we remain convinced that the targeted statements were protected by the attorney-client privilege.
 
 
 28
 First, the Government argues that Bauer's situation is analogous to cases from other circuits holding that documentary information provided to an attorney by a client for inclusion in the client's tax return falls outside of the scope of the privilege. The Seventh Circuit explicitly extended this rationale to cover documentary information relevant to bankruptcy proceedings:
 
 
 29
 When information is disclosed for the purpose of assembly into a bankruptcy petition and supporting schedules, there is no intent for the information to be held in confidence because the information is to be disclosed on documents publicly filed with the bankruptcy court.
 
 
 30
 United States v. White, 950 F.2d 426, 430 (7th Cir.1991). The problem with the Government's argument is that the Seventh Circuit's rationale does not apply to this case. Rivera's testimony did not involve the disclosure of documentary information that Bauer intended to use in the preparation of his bankruptcy petition. Instead, the evidence at issue here consists entirely of oral statements of legal advice made by attorney Rivera to client Bauer. The cases cited by the Government to support its first alternative argument are simply inapposite to this evidence.
 
 
 31
 As its second alternative ground, the Government argues that Rivera's statements fall under the crime-fraud exception to the attorney-client privilege, an argument explicitly rejected by the district court.[3] "It is the purpose of the crime-fraud exception ... to assure that the 'seal of secrecy' between lawyer and client does not extend to communications made for the purpose of getting advice for the commission of a fraud or crime." United States v. Zolin, 491 U.S. 554, 563, 109 S.Ct. 2619, 2626, 105 L.Ed.2d 469 (1989) (quotation and citation omitted). "To invoke the crime-fraud exception successfully, the government has the burden of making a prima facie showing that the communications were in furtherance of an intended or present illegality and that there is some relationship between the communications and the illegality." Chen, 99 F.3d at 1503 (quotation omitted). "The test for invoking the crime-fraud exception to the attorney-client privilege is whether there is 'reasonable cause to believe that the attorney's services were utilized in furtherance of the ongoing unlawful scheme.' " Id. (quoting In re Grand Jury Proceedings, 87 F.3d at 381). The exception applies "even where the attorney is unaware that his advice may further an illegal purpose." Laurins, 857 F.2d at 540.
 
 
 32
 In this case, there is no reasonable basis for concluding that Rivera's legal advice to Bauer was used by Bauer "in furtherance of" his fraudulent scheme to falsify his bankruptcy petition. Rivera advised Bauer to disclose all of his assets and avoid lying on his bankruptcy petition. Bauer in fact did precisely the opposite. It is impossible to discern a causal connection or functional relationship between the advice given by Rivera and the actions taken by Bauer. Therefore, the crime-fraud exception to the attorney-client privilege does not apply here.
 
 
 33
 Our conclusion that it was error to admit Rivera's statements concerning the legal advice he gave to Bauer does not end the inquiry. We can still affirm Bauer's conviction if we conclude that the district court's error was harmless. Because a violation of the attorney-client privilege is not an error of constitutional magnitude,[4] the Government must show that the prejudice resulting from the error was more probably than not harmless. United States v. Morales, 108 F.3d 1031, 1040 (9th Cir.1997). This requires the Government to show a "fair assurance" that the verdict was not substantially swayed by the error. United States v. Annigoni, 96 F.3d 1132, 1144 n. 9 (9th Cir.1996). See also Kotteakos v. United States, 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946). After considering the magnitude of the error and the Government's other evidence against Bauer, we conclude that the violation of Bauer's attorney-client privilege was not harmless.
 
 
 34
 It is important to note that the attorney-client privilege is, perhaps, the most sacred of all legally recognized privileges, and its preservation is essential to the just and orderly operation of our legal system. "The attorney-client privilege is the oldest of the privileges for confidential communications known to the common law." Upjohn Co. v. United States, 449 U.S. 383, 389, 101 S.Ct. 677, 682, 66 L.Ed.2d 584 (1981). The defining principle behind this privilege
 
 
 35
 is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice. The privilege recognizes that sound legal advice or advocacy serves public ends and that such advice or advocacy depends upon the lawyer's being fully informed by the client.
 
 
 36
 Id. That purpose "requires that clients be free to 'make full disclosure to their attorneys of past wrongdoings.' " Zolin, 491 U.S. at 562, 109 S.Ct. at 2625 (quoting Fisher v. United States, 425 U.S. 391, 403, 96 S.Ct. 1569, 1577, 48 L.Ed.2d 39 (1976)). The attorney-client privilege has deep roots in this country's historical jurisprudence:
 
 
 37
 The rule which places the seal of secrecy upon communications between client and attorney is founded upon the necessity, in the interest and administration of justice, of the aid of persons having knowledge of the law and skilled in its practice, which assistance can only be safely and readily availed of when free from the consequences or the apprehension of disclosure.
 
 
 38
 Hunt v. Blackburn, 128 U.S. 464, 470, 9 S.Ct. 125, 127, 32 L.Ed. 488 (1888). Therefore, when faced with a violation of a criminal defendant's attorney-client privilege, we will make a particularly careful review of the Government's other evidence to determine whether this evidence, in light of the violation of this fundamentally important privilege, gives us a fair assurance that the verdict was not substantially swayed by the error.
 
 
 39
 Bauer's entire defense was that he did not possess the requisite criminal intent for conviction, claiming that he was the victim of his own "ignorance," "mistake," or "stupidity." (Appellant's Opening Br. at 18.) Bauer never denied that he failed to list assets in his bankruptcy petition that should have been listed or that he transferred assets within twelve months of filing the petition. At the beginning of his closing argument, Bauer's attorney told the jury: "I'm going to talk about the evidence that I suggest to you raises a reasonable doubt as to whether or not Mr. Leonhard Bauer had the intent to defraud or cheat. That is really the only issue in the case." In their briefs to this court, the parties view the strength of the Government's other evidence of Bauer's intent quite differently: Bauer characterizes the evidence as "weak," while the Government characterizes the evidence as an "overwhelming" indication of Bauer's guilt. This dual hyperbole is not very helpful in determining the effect of the error on the jury's decision and necessitates a careful examination of the Government's evidence of intent.
 
 
 40
 A close examination of the evidence presented by the Government indicates that almost all of it only supports indirectly, at best, the Government's theory that Bauer possessed the requisite intent to commit bankruptcy fraud. The Government identifies the following evidence to support its theory of intent: (1) the State Farm theft-loss inventory forms listing undisclosed assets; (2) Bauer's request for a confidentiality agreement with State Farm (a fact of tenuous relevance); (3) the omission of assets from Bauer's bankruptcy petition; (4) the fact that Bauer had opportunities to come forward and reveal other assets, but failed to do so and never amended his bankruptcy petition; (5) a residential loan application listing the joint net worth of Bauer and his wife at $600,000.00; (6) an insurance policy, purchased shortly before the bankruptcy petition was filed, from which Bauer took a cash loan and placed the money in an account for his grandson, thereafter transferring the policy to his wife; and (7) Bauer's sworn statement that he understood the concept of community property. This evidence hardly amounts to an overwhelming indication of Bauer's allegedly fraudulent intent. Indeed, this evidence is just as consistent with Bauer's defense that the omissions and illegal transfers were the result of Bauer's ignorance, mistake, or stupidity. The Government attempted to prove Bauer's intent to defraud by employing the familiar strategy of showing what Bauer actually did, but this does little more than raise a general inference that his behavior could have been motivated by a criminal intent.
 
 
 41
 The Government offered only two other pieces of evidence that arguably would allow a jury to infer the presence of a guilty mind. First, the Government argued that the fact that Bauer made most of the illegal transfers of property shortly before filing the bankruptcy petition is evidence that Bauer was hiding his assets. Second, the Government points to a portion of testimony from Bauer's former bookkeeper, Margaret Greenlaw. On direct examination by the Government, Greenlaw was asked about statements Bauer made concerning the ownership of his automobiles. After the Government asked what Bauer said regarding the transfer of ownership, Greenlaw testified that Bauer said "[t]hat he was going to-he had 12 months before he filed a bankruptcy to put his vehicles into somebody else's name."[5]
 
 
 42
 Although this evidence, viewed as a whole, arguably supports the Government's theory of Bauer's criminal intent, it is certainly not overwhelming. Greenlaw's testimony, in particular, is of dubious value. Interpreted literally, her statement seems to indicate that Bauer believed he could transfer property during the twelve months prior to filing the bankruptcy petition. Therefore, Greenlaw's testimony actually tends to support Bauer's theory that his own ignorance, mistake, or stupidity led to his downfall. Coupling this testimony with the fact that Bauer in fact made such transfers shortly before filing the bankruptcy petition does not enhance the value of Greenlaw's testimony to the Government's theory.
 
 
 43
 The testimony from Bauer's attorney, however, given in violation of the attorney-client privilege, almost certainly sealed Bauer's fate in the eyes of the jury. After Rivera's testimony, the Government was able to argue that Bauer was explicitly told about the bankruptcy rules requiring him to disclose all of his assets and refrain from transferring property within a year of filing the petition. This testimony defeated any chance of success for Bauer's sole defense at trial that he was the victim of his own ignorance, mistake, or stupidity. Combined with the evidence that Bauer blatantly defied his attorney's explicit advice by transferring some assets and omitting others from the bankruptcy petition, it is not at all surprising that the jury found the requisite criminal intent and convicted Bauer.
 
 
 44
 We find it insightful that, both before and during the criminal trial, the Government did not view Rivera's testimony as insignificant to its case against Bauer. The Government spent a lot of effort to present that testimony at trial and emphasized its importance to the jury in closing argument. Fifteen pages of the Government's thirty-page trial brief were devoted exclusively to legal arguments supporting the admissibility of Rivera's testimony. Rivera was the Government's final witness in its case-in-chief, creating the image that this was the Government's star witness who should leave the jury with a lasting impression of the importance of the attorney's testimony. Finally, the Government emphasized Rivera's testimony in its closing argument to the jury:
 
 
 45
 Counsel also said "Well, under penalty of perjury, we all sign stuff that we don't really read." That might fly as a defense if Mr. Bauer's own attorney had not testified that he advised Mr. Bauer before this thing was signed that it was going to be signed under penalty of perjury.
 
 
 46
 Even if Mr. Bauer somehow didn't read where it says "under penalty of perjury," he was told by his attorney. And his attorney said, "We went over-I gave him the form. He filled it out. We went over it item-by-item."
 
 
 47
 For the Government now to argue on appeal that its other evidence of Bauer's intent was "overwhelming," after having fought so hard to present Rivera's testimony to the jury and emphasizing it in closing argument, is unconvincing. Because we are not left with a fair assurance that the verdict was not substantially swayed by the error of admitting Rivera's testimony, Bauer's conviction must be reversed.[6]
 
 CONCLUSION
 
 48
 Bauer's attorney-client privilege, the oldest and most revered of the legally recognized privileges protecting confidential communications, was violated by the admission of Rivera's testimony at Bauer's criminal trial. Though it does not rise to the level of constitutional error, we do not view the violation of the sacred trust between an attorney and his client as an insignificant occurrence. Given the conclusiveness with which Rivera's testimony rebutted Bauer's sole defense at trial, and the Government's otherwise tenuous evidence of Bauer's criminal intent that is arguably consistent with Bauer's theory of defense, we conclude that the Government has not proven by a preponderance of the evidence that there is a fair assurance that the jury's verdict was not substantially swayed by the admission of Rivera's testimony. We therefore REVERSE Bauer's conviction.
 
 
 49
 REVERSED and REMANDED for a new trial or other appropriate disposition.
 
 
 
 [1]
 Bauer began serving his prison term on July 16, 1997, and is currently incarcerated
 
 
 [2]
 Both sides agree that the case cited by the district court, United States v. Laurins, 857 F.2d 529 (9th Cir.1988), was not applicable to this ground for admission but, rather, applied to the crime-fraud exception, which is discussed below
 
 
 [3]
 The standard of review for deciding whether the Government has made a prima facie showing that the crime-fraud exception applies is unclear in this circuit. See In re Grand Jury Proceedings, 87 F.3d 377, 380 (9th Cir.) (noting the options of abuse of discretion or de novo review), cert. denied, --- U.S. ----, 117 S.Ct. 333, 136 L.Ed.2d 246 (1996). We need not resolve this uncertainty in this case, however, because whatever the standard, the crime-fraud exception does not apply to the circumstances of this case
 
 
 [4]
 "Issues concerning application of the attorney-client privilege in the adjudication of federal law are governed by federal common law." Clarke, 974 F.2d at 129. See also Zolin, 491 U.S. at 562, 109 S.Ct. at 2625-26; Fed.R.Evid. 501
 
 
 [5]
 The Government also argues that the testimony of Bauer's stepson corroborates Greenlaw's testimony that Bauer knew that it was unlawful to transfer assets within twelve months of filing a bankruptcy petition. This is, however, an incorrect characterization of the stepson's testimony. The only testimony given by the stepson regarding the automobiles was to confirm that Bauer wanted to transfer one of his cars to his daughter Angelique. The stepson gave no testimony regarding Bauer's knowledge of the bankruptcy rules or his reasons for making the transfer
 
 
 [6]
 Because we reverse Bauer's conviction for the violation of his attorney-client privilege, we need not reach Bauer's other arguments that he received ineffective assistance of counsel and that the restitution order contains multiple errors, because those issues have been rendered moot