UNITED STATES of America,
Plaintiff–Appellee,

v.

Tei Fu CHEN;  The Sunrider
Corporation, Defendants–
Appellants.

No. 95–50228.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Sept. 15, 1995.

Decided Nov. 4, 1996.

Gary S. Lincenberg, Bird, Marella, Boxer, Wolpert & Matz, Los Angeles, CA, for defendants-appellants.

George B. Newhouse, Jr., Assistant United States Attorney, Los Angeles, CA, for plaintiff-appellee.

Before: T.G. NELSON and KLEINFELD, Circuit Judges, and WILKEN, District Judge.[*]

KLEINFELD, Circuit Judge:

This case deals with the scope of the crime-fraud exception to the attorney-client privilege, where the attorney is innocent of any wrongdoing or guilty knowledge.

## FACTS

Mr. Chen and his wife own Sunrider Corporation and operate TF Chen Products, Inc., a subsidiary of Sunrider. The companies manufacture health food and skin care products and import from Taiwan, Hong Kong, Japan, and other countries. The importation tariffs the companies pay depend on the price they declare they paid for the goods. Undervaluation may result in administrative, civil, and criminal penalties. A statutory procedure allows an importer to mitigate or avoid penalties by filing a disclosure statement before the Customs Service learns of the undervaluation independently. *See* 19 U.S.C. § 1592(c)(4).

Of course an importer also pays taxes on profits. The higher the cost of goods sold, then, other things being equal, the lower the level of income taxes. Thus, an importer saves money on tariffs to the extent the goods are cheap, but pays more in income tax. Conversely, the company saves money on taxes, but pays higher tariffs, to the extent its cost of goods is higher.

The Customs duties on the higher values are much less than the additional taxes which would be due based on the true values. Thus an importer can come out ahead by overpaying tariffs and underpaying income taxes, by overstating the cost of the goods imported.

Mr. and Mrs. Chen and Sunrider were indicted for conspiracy, tax evasion, and other crimes. The indictment alleged that Mr. and Mrs. Chen imported their inventory and paid tariffs based on the true invoiced price. Then Mr. Chen's sister, Jau Hwa, the comptroller of Sunrider, would prepare entirely fictional invoices on blank forms from Sunrider's Hong Kong affiliate, owned largely by the Chens and operated by Mrs. Chen's brother. The fake invoices purported to charge much higher prices for the goods. The fake invoices were then given to Sunrider's accountants to prepare trial balances, which were themselves given to Sunrider's tax preparers. Thus, tariffs would be paid on the true lower price of the goods, but taxes would be paid as though the goods had cost much more than they really did. Mr. Chen periodically instructed Jau Hwa to wire excess money to the Hong Kong affiliate's bank accounts, to maintain the fiction that

[*] The Honorable Claudia Wilken, United States District Judge for the Northern District of California, sitting by designation.

Sunrider's payments were based on the fake invoices, not the real ones. Mr. and Mrs. Chen would subsequently recover the excess with the connivance of Mrs. Chen's brother. The government alleges that the Chens skimmed almost $90 million this way.

According to the indictment, the Chens eventually became concerned that IRS and Customs enforcement agents might communicate on their case and discover the difference in the claimed cost of their inventory. To protect themselves, they caused a disclosure to be made to Customs, purporting to acknowledge that they had understated their cost of goods imported. In the disclosure, they stated that the true cost of the goods was what they had reflected in their tax returns. Thus, the original Customs declarations were true, but the correcting disclosure was actually not a disclosure at all, but a fraud, intended to shield their tax evasion scheme. This scheme is entirely theoretical at this point, because nothing has yet been proven.

Mr. Chen's attorneys, Stein, Shostak, Shostak & O'Hara, filed a prior disclosure pursuant to 19 U.S.C. § 1592(c)(4) and section 162.74 of the Customs regulations stating that a review gave rise to the discovery that "certain charges relating to the imported products may not have been properly included in the entered value." A check for over $381,000 was enclosed with the disclosure. The law firm said that more money would be paid as more data were assembled revealing underpayments.

Jau Hwa eventually left Sunrider. She then gave the government materials she had taken from Sunrider's files, and gave a customs agent her account of events on which the indictment is based. The Customs agent filed an affidavit saying that according to Jau Hwa, "Marjorie Shostak [Sunrider's lawyer] proposed that Sunrider should file a disclosure with Customs." Though this affidavit does not say in so many words that Ms. Shostak knew that the disclosure would be false, and intended to hide a tax evasion scheme, the Assistant United States Attorney argued that the differences between the initial and supplemental invoices was "substantial enough to put any reasonable profes-

sional on notice that this was, in all likelihood, a fraudulent scheme."

Joseph P. Cox had worked on the Sunrider matter for the Stein, Shostak firm; James D. Wilets was in-house Sunrider counsel. Both were subpoenaed before the Grand Jury. The Chens and Sunrider moved to quash these two subpoenas based on their attorney-client privilege. The government moved for an order allowing the subpoenas, and establishing that Sunrider's communications to the lawyers were not privileged because of the crime-fraud exception. The government included with its cross-motion the affidavits from Agent Diciurcio and from Jau Hwa, disclosing Sunrider's alleged communications with its lawyers.

Sunrider and the Chens opposed the government's cross-motion. Their declarations stated that, upon review of documents the government disclosed, they found that Jau Hwa had stolen a box of documents from Sunrider, including "privileged correspondence between Sunrider's general counsel and outside counsel," and that Jau Hwa had thus revealed attorney-client communications. The declarations and oppositions say that Jau Hwa had demanded millions of dollars as the company became successful, and when Mr. Chen would not pay, she left and started a competing company with another sister, while trying to damage Sunrider and lure away its customers. Papers were submitted to show that there was no tax evasion at all. The defense theory was that Sunrider had a more complex scheme for paying its suppliers than the government understood. The scheme, developed by Ernst & Whinney, provided for purchasing inventory by letters of credit cashed on shipment and a loan agreement for a remaining balance. The tariff underpayment resulted from using only the amount paid on the letter of credit, and leaving out the loan agreement, so there was no intent to evade income tax by overstating cost of goods sold.

Ms. Shostak filed a declaration that her firm was employed to avoid litigation by bringing Sunrider into compliance with the Customs laws, by voluntarily disclosing supplemental payments already reported to the IRS. Ms. Shostak countered the attack on

her professional integrity by the Assistant United States Attorney and stated that the accountants "consistently said that the payments to Paget were legitimately a part of the costs of the goods sold for tax purposes." She explained in detail the nature of the transactions and why her firm "saw nothing to suggest that a prior disclosure would further some alleged tax evasion scheme." She stated plainly that neither she nor any attorney to her knowledge had engaged in the conduct alleged by Jau Hwa, done anything to mislead Customs, or had any knowledge of or participation in any fraud on the government. Mr. Wilets and Mr. Cox also filed affidavits explaining what services they had performed on behalf of the Chens and Sunrider, stating that to the best of their knowledge neither they, the accountants, the Ernst & Young Customs group assisting with the prior disclosure, nor anyone else involved, including the Chens, had ever intended to further any tax evasion scheme or known about such a scheme. General counsel for Sunrider, Cynthia Muldrow, filed an affidavit establishing that no one had authorized Jau Hwa to take any documents with her when she left the corporation, or to disclose any attorney-client information to anyone outside Sunrider.

After considering all the evidence, the district judge made a finding of fact in favor of the attorneys regarding the government's imputation of wrongdoing on their part. He found "the attorneys are not involved in the involved crime," because there was not even a "prima facie case that these attorneys in any way participated in or joined the alleged criminal conspiracy." The judge stated that he was disregarding what Jau Hwa wrote in her affidavit regarding what Ms. Shostak supposedly told the Chens. The judge nevertheless denied the Chens' motions to quash the Grand Jury subpoenas, "provided the questioning is confined to matters concerning the disclosures which TFCP/Sunrider made to United States Customs in 1989–1990." The district judge expressly found a prima facie case establishing reasonable cause to believe that the Chens and Sunrider had used their lawyers to make false statements, albeit not known to the lawyers to be false, to the Customs Service:

The Court finds that the government has carried its burden of establishing a *prima facie* case that the Defendants utilized their attorneys in connection with the alleged conspiracy to make false statements to the United States Customs Service, and that under the crime-fraud exception, there is no valid attorney-client privilege attached to any communication or document made in furtherance of or relating to the said Disclosures which TFCP/Sunrider made to the United States Customs Service in 1989–1990. The Court specifically finds, based on the record before it, that there exists reasonable cause to believe that the attorneys' services, both by James D. Wilets, corporate counsel and by Joseph P. Cox of the Stein, Shostak firm, were utilized by Defendants in furtherance of their ongoing unlawful scheme. For that reason, no objection to answering the aforesaid questioning may be based upon the attorney-client privilege.

Because the government has not made out a prima facie case that these attorneys in any way participated in or joined the alleged criminal conspiracy, James D. Wilets and Joseph P. Cox do have the right not to disclose "opinion work product" as distinguished from "fact work product" in connection with their representation of Defendants.

## ANALYSIS

■ We review denial of a motion to quash a Grand Jury subpoena for abuse of discretion. *In re Grand Jury Subpoenas*, 803 F.2d 493, 496 (9th Cir.1986), *opinion corrected*, 817 F.2d 64 (1987).

The attorney-client privilege is essential to preservation of liberty against a powerful government. People need lawyers to guide them through thickets of complex government requirements, and, to get useful advice, they have to be able to talk to their lawyers candidly without fear that what they say to their own lawyers will be transmitted to the government. *See United States v. Zolin*, 491 U.S. 554, 562, 109 S.Ct. 2619, 2625–26, 105 L.Ed.2d 469 (1989) ("clients [must] be free to 'make full disclosure to their attorneys' of

past wrongdoings ... in order that the client may obtain 'the aid of persons having knowledge of the law and skilled in its practice' "); *Upjohn Co. v. United States,* 449 U.S. 383, 389, 101 S.Ct. 677, 682, 66 L.Ed.2d 584 (1981) ("assistance can only be safely and readily availed of when free from the consequences or the apprehension of disclosure").

Much of what lawyers actually do for a living consists of helping their clients comply with the law. *See Upjohn,* 449 U.S. at 392, 101 S.Ct. at 684 ("corporations ... 'constantly go to lawyers to find out how to obey the law' "). Clients unwittingly engage in conduct subject to civil and even criminal penalties. *See United States v. Weitzenhoff,* 35 F.3d 1275, 1293–95 (9th Cir.1993) (Kleinfeld, J. dissenting from order rejecting suggestion for rehearing *en banc*). This valuable social service of counseling clients and bringing them into compliance with the law cannot be performed effectively if clients are scared to tell their lawyers what they are doing, for fear that their lawyers will be turned into government informants. *See Fisher v. United States,* 425 U.S. 391, 403, 96 S.Ct. 1569, 1577, 48 L.Ed.2d 39 (1976) ("if the client knows that damaging information could ... be obtained from the attorney following disclosure ... the client would be reluctant to confide in his lawyer and it would be difficult to obtain fully informed legal advice"). In our libertarian tradition, what is not prohibited is generally permitted, so lawyers' counseling regarding prohibitions necessarily and desirably educates clients as to their liberties:

> Lawyers are constantly called upon to tell people, in advance of action or developed controversy, what their duties are to other people and to the government, and what the duties of others are to them. In the case of tightly defined requirements, such as the return and payment of taxes, this may call for close, meticulous guidance. For the most part, however, what are involved are prohibitions. Safe-side counselling is commonly the lawyer's task. When a continuing course of conduct is in question, this may require not only an informed appraisal of risk but the preparation of a plan of action to minimize it....

> When people do not have duties, they have liberties. Counselling about the one is in some sense counselling about the other.... even a man's liberty of singing in the shower may come into question if a neighbor complains that it is a nuisance.

Henry M. Hart & Albert M. Sacks, *The Legal Process: Basic Problems in the Making and Application of Law* 205–06 (Tent. ed. 1958).

■ It is a truism that while the attorney-client privilege stands firm for client's revelations of past conduct, it cannot be used to shield ongoing or intended future criminal conduct. *Zolin,* 491 U.S. at 563, 109 S.Ct. at 2626. That principle is easily applied when a lawyer is retained to defend a client in a criminal prosecution or civil litigation relating to an entirely completed course of conduct. But it is difficult to apply when the lawyer's role is more in the nature of business planning or counseling or bringing the client into compliance for past wrongs, as opposed to simply defending the client against a charge relating to past wrongs. The act of bringing a client into compliance with the law ordinarily and properly engages the lawyer in an effort to assure the client is sanctioned no more harshly than the law requires. Because of the delicacy and importance of the attorney-client privilege in the counseling relationship, both the district court's task and ours are especially difficult when the United States Attorney insists upon using a person's own lawyer against him.

■ The government argues without citation that "[w]here attorneys are involved in business decision-making, or, as Cox and Wilets acted here, as spokespersons for a company, they are clearly not acting as 'professional legal advisors.' " The government argues that this proposition takes the lawyers' planning for correcting understated customs declarations out of the privilege.

■ The lawyers in this case were "spokespersons" only in the sense that, as lawyers, they communicated their clients' positions to the government agencies dealing with their clients. They were not engaged in a public relations business separate from

their law firm, as the government's term "spokespersons" may imply. For a lawyer to tell a judge, jury, or administrative agency, his client's position and the basis for it, that is, to be his client's spokesman, is a traditional and central attorney's function as an advocate. The communications between lawyer and client which enable a lawyer to perform this function are privileged. The government's argument implies that when a lawyer speaks on a client's behalf to a jury, the client forfeits his privilege for the attorney-client communications relating to the lawyer's statements on the client's behalf, obviously an untenable proposition.

■ The government's phrase, "involved in business decision-making," obscures the issue. A client is entitled to hire a lawyer, and have his secrets kept, for legal advice regarding the client's business affairs. This principle has long been the law:

> The principle we take to be this; that so numerous and complex are the laws by which the rights and duties of citizens are governed, so important is it that they should be permitted to avail themselves of the superior skill and learning of those who are sanctioned by the law as its ministers and expounders, both in ascertaining their rights in the country, and maintaining them most safely in the courts, without publishing those facts, which they have a right to keep secret, but which must be disclosed to a legal advisor and advocate, to enable him successfully to perform the duties of his office, that the law has considered it the wisest policy to encourage and sanction this confidence, by requiring that on such facts the mouth of the attorney shall be forever sealed.

*Hatton v. Robinson*, 31 Mass. (14 Pick) 416, 422 (1833) (Shaw, C.J.), cited in 8 John H. Wigmore, *Evidence* at 547 (McNaughton rev. ed. 1961). It is not true, and has not been true since the early nineteenth century, that the confidences of a client are "respected only when given for the purpose of securing aid in *litigation*." 8 Wigmore, *supra*, § 2291, at 559 (emphasis in original). "The attorney-client privilege protects confidential disclosures made by a client to an attorney in order to obtain legal advice, . . . as well as an attorney's advice in response to such disclosures." *In re Grand Jury Investigation (Corporation)*, 974 F.2d 1068, 1070 (9th Cir. 1992) (quotations and citation omitted). The attorney-client privilege applies to communications between lawyers and their clients when the lawyers act in a counseling and planning role, as well as when lawyers represent their clients in litigation. Indeed, the axiom that "every man knows the law" presupposes that everyone can find it out by consulting a lawyer, before being hauled into court for violating the law. 8 Wigmore, *supra*, § 2291 at 547–48 (citations omitted).

■ That a person is a lawyer does not, *ipso facto*, make all communications with that person privileged. The privilege applies only when legal advice is sought "from a professional legal advisor *in his capacity as such.*" *Id.* § 2292 at 554 (emphasis added). For example, where a counterfeiter hired a man who was a lawyer to buy printing equipment for him, no privilege could be asserted because the lawyer was merely a "business agent" and not a "legal advisor." *United States v. Huberts*, 637 F.2d 630, 640 (9th Cir.1980). Likewise, lawyer-client communications were not privileged where the "clients did not approach him for legal advice and assistance, but rather with the aim of finding [investment opportunities]." *Liew v. Breen*, 640 F.2d 1046, 1050 (9th Cir.1981). A lawyer's account ledgers revealing a client's financial transactions with third parties, which did not reveal the client's communications with the lawyer, or the lawyer's advice, were not privileged. *In re Fischel*, 557 F.2d 209, 212 (9th Cir.1977).

■ If a person hires a lawyer for advice, there is a rebuttable presumption that the lawyer is hired "as such" to give "legal advice," whether the subject of the advice is criminal or civil, business, tort, domestic relations, or anything else. But the presumption is rebutted when the facts show that the lawyer was "employed without reference to his knowledge and discretion in the law":

> A lawyer is sometimes employed without reference to his knowledge and discretion in the law—as where he is charged with finding a profitable investment for trust funds. So, too, one not a lawyer is some-

times asked for legal advice—as where a policeman or a clerk of court is consulted. It is not easy to frame a definite test for distinguishing *legal from nonlegal advice.* Where the general purpose concerns legal rights and obligations, a particular incidental transaction would receive protection, though in itself it were merely commercial in nature—as where the financial condition of a shareholder is discussed in the course of a proceeding to enforce a claim against a corporation. But apart from such cases the most that can be said by way of generalization is that a matter committed to a professional legal adviser *is prima facie so committed for the sake of the legal advice* which may be more or less desirable for some aspect of the matter, and is therefore within the privilege unless it clearly appears to be lacking in aspects requiring legal advice.

8 Wigmore, *supra,* § 2296, at 566–67 (emphasis in original). Calling the lawyer's advice "legal" or "business" advice does not help in reaching a conclusion; it *is* the conclusion. That the lawyers were "involved in business decision-making," as the government puts it, is irrelevant. What matters is whether the lawyer was employed with or without "reference to his knowledge and discretion in the law," *id.,* to give the advice. In this case, the attorneys were employed for their legal knowledge, to bring their clients into compliance with the law in the least burdensome way possible (so far as the lawyers knew). Their communications with their clients were therefore within the scope of the attorney-client privilege.

▮▮▮▮ Appellants correctly argue that Jau Hwa, a past employee of Sunrider Corporation, lacked authority to waive the corporation's attorney-client privilege. The attorney-client privilege applies to communications between corporate employees and counsel, made at the direction of corporate superiors in order to secure legal advice. *Upjohn,* 449 U.S. at 390–394, 101 S.Ct. at 683–685. This "same rationale applies to the ex-employees." *In re Coordinated Pretrial Proceedings, etc.,* 658 F.2d 1355, 1361 n. 7 (9th Cir.1981). "[T]he power to waive the corporate attorney-client privilege rests with the corporation's management and is

normally exercised by its officers and directors." *Commodity Futures Trading Comm'n v. Weintraub,* 471 U.S. 343, 348, 105 S.Ct. 1986, 1991, 85 L.Ed.2d 372 (1985). "[W]hen control of a corporation passes to new management, the authority to assert and waive the corporation's attorney-client privilege passes as well." *Id.* at 349, 105 S.Ct. at 1991. It follows *a fortiori* that since a corporate employee cannot waive the corporation's privilege, that same individual as an ex-employee cannot do so. An employee must generally keep an employer's confidences. *See* Restatement (Second) of Agency § 395 (1958). The uncontradicted evidence in the record established that Jau Hwa never was given any authority to waive the attorney-client privilege. Thus, Jau Hwa's disclosures of attorney-client communications could not and did not waive the privilege.

▮▮▮▮ Appellants next argue that the government improperly submitted Jau Hwa's affidavit and Agent Diciurcio's affidavit, thereby disclosing to the judge material protected by the attorney-client privilege, before the court decided that such a disclosure should be made. They are correct. The Supreme Court established in *Zolin* that the parties seeking to strip attorney-client communications of their privilege under the crime-fraud exception must satisfy the court with some showing prior to judicial *in camera* review of the privileged material.

> Before engaging in *in camera* review to determine the applicability of the crime-fraud exception, the judge should require a showing of a factual basis adequate to support a good faith belief by a reasonable person that *in camera* review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies.

> Once that showing is made, the decision whether to engage in *in camera* review rests in the sound discretion of the district court. The court should make that decision in light of the facts and circumstances of the particular case, including, among other things, the volume of materials the district court has been asked to review, the

relative importance to the case of the alleged privileged information, and the likelihood that the evidence produced through *in camera* review, together with other available evidence then before the court, will establish that the crime-fraud exception does apply.

*Zolin,* 491 U.S. at 572, 109 S.Ct. at 2631 (internal citation and quotations omitted). Thus there are two steps. First the government must satisfy the judge that there is "a factual basis adequate to support a good faith belief by a reasonable person that *in camera* review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies," and then if the judge decides this question in favor of the government, the otherwise privileged material may be submitted for *in camera* examination. *Id.* The government cannot show the otherwise privileged material to the judge unless and until the judge has made this preliminary judgment. In *Zolin,* the prosecutor thought that it was unduly cumbersome to approach the district court twice, first to make a showing that the judge should read the putatively privileged material in order to decide whether the crime-fraud exception applied, and second to decide whether the exception applied. The Supreme Court decided that, cumbersome or not, that is what the prosecutor had to do.

In the case at bar, the United States Attorney submitted Jau Hwa's disclosures of attorney-client communications, and Diciurcio's affidavit telling more about her disclosures, without first making a *prima facie* showing and obtaining the court's permission. This was incorrect under *Zolin.* Apparently, as in *Zolin,* the United States Attorney had one view of what procedure is appropriate, and the Supreme Court of the United States had another. As we previously explained in another case involving the same United States Attorney's Office, even if the office already has the putatively privileged material, the prosecutor still must go through the two-step procedure of *Zolin. United States v. De La Jara,* 973 F.2d 746, 749 (9th Cir.1992).

■ But the district judge recognized that there was an incorrect submission. He disregarded what Jau Hwa said in making his decision that the crime-fraud exception applied, and expressly said he was disregarding it. Violation of the *Zolin* two-step procedure was therefore harmless. *See In re Grand Jury Investigation (Corporation),* 974 F.2d at 1073.

■ What is left of the case is whether the government's showing, without Jau Hwa's disclosures, was adequate to invoke the crime-fraud exception. It was. "To invoke the crime-fraud exception successfully, the government has the burden of making a prima facie showing that the communications were in furtherance of an intended or present illegality and that there is some relationship between the communications and the illegality." *In re Grand Jury Proceedings (The Corporation),* 87 F.3d 377, 380 (9th Cir.1996) (internal quotations and alterations omitted). Mere allegations or suspicion by the government are insufficient. But proof beyond a reasonable doubt is not necessary to justify application of the crime-fraud exception. *Id.* at 381. The test for invoking the crime-fraud exception to the attorney-client privilege is whether there is "reasonable cause to believe that the attorney's services were utilized in furtherance of the ongoing unlawful scheme." *Id.* (internal quotations and alterations omitted). Reasonable cause is more than suspicion but less than a preponderance of evidence. The government must submit "evidence that if believed by the jury would establish the elements of an ongoing violation." *United States v. Laurins,* 857 F.2d 529, 541 (9th Cir.1988).

In this case, there was reasonable cause to believe that the Chens and Sunrider were using attorneys' services to conceal income tax fraud. The government submitted copies of blank pre-signed invoices from Sunrider's supplier, which would facilitate the kind of fraud claimed by the government. The portions of Jau Hwa's affidavit other than her disclosures of attorney-client communications, tended to show, if true, that the company was claiming a low value of goods purchased for Customs purposes, a high value for income tax purposes, and was proposing to make a fraudulent corrective disclosure to

Customs in order to evade income taxes. The evidence, excluding the improperly submitted disclosures of attorney-client communications, further gave reasonable cause to believe that the Chens were using their lawyers to help prepare the paperwork for this fraudulent scheme, and using their prestige in the Customs bar to hide it.

■ The district judge found that the lawyers in this case were innocent of any wrongful intent, and had no knowledge that their services were being used to trick the Customs Service or the IRS. But the lawyers' innocence does not preserve the attorney-client privilege against the crime-fraud exception. The privilege is the client's, so "it is the client's knowledge and intentions that are of paramount concern to the application of the crime-fraud exception; the attorney need know nothing about the client's ongoing or planned illicit activity for the exception to apply. It is therefore irrelevant ... that [the lawyers] may have been in the dark." *In re Grand Jury Proceedings (The Corporation),* 87 F.3d at 381–82. *See also Laurins,* 857 F.2d at 540 ("this exception applies even where the attorney is unaware that his advice may further an illegal purpose").

■ Appellants argue that because the prosecutors should not have questioned Jau Hwa about privileged information she learned while employed by Sunrider, the judge should have quashed the subpoena as a sanction. It was "within the discretion of the district court to act in an appropriate manner to discipline [the prosecutor] if he subverted [ ] the attorney-client relationship." *United States v. Lopez,* 4 F.3d 1455, 1463 (9th Cir. 1993). Because use of her disclosures of attorney-client communications wound up being immaterial to the district judge's decision, there was no prejudice, so the district judge was within his discretion in denying appellants' motion for a broad sanction. *See id.* at 1464.

## CONCLUSION

The prosecution should have followed the two-step submission procedure in *Zolin,* and did not. But that error was harmless, because the judge disregarded the incorrectly submitted attorney-client communications. The attorneys' lack of any guilty knowledge did not matter, because the privilege was the client's, and the client's misconduct sufficed to lose it, despite the lawyers' innocence of wrongdoing. The properly submitted materials established reasonable cause to believe that the Chens and Sunrider were using their lawyers as part of an ongoing scheme to evade taxes, so the district judge was within his discretion in allowing the government to compel disclosures under the crime-fraud exception.

AFFIRMED.