**FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 09-50161 |
| Plaintiff - Appellant, | D.C. No. 8:08-CR-00139-cjc-2 |
| v. | |
| WILLIAM J. RUEHLE, | OPINION |
| Defendant - Appellee. | |

Appeal from the United States District Court
for the Central District of California
Cormac J. Carney, District Judge, Presiding

Argued and Submitted September 1, 2009
Pasadena, California

Filed

Before: FISHER, GOULD, and TALLMAN, Circuit Judges.

Opinion by Circuit Judge Richard C. Tallman

TALLMAN, Circuit Judge:

We here explore the treacherous path which corporate counsel must tread under the attorney-client privilege when conducting an internal investigation to advise a publicly traded company on its financial disclosure obligations.

Defendant-Appellee William J. Ruehle is the former Chief Financial Officer ("CFO") of Broadcom Corporation, a California-based, publicly traded semiconductor supplier that came under intense scrutiny for its suspected backdating of company stock options. Following a government investigation, Ruehle was criminally indicted for his involvement in an alleged backdating scheme that ultimately resulted in Broadcom's restatement of its earnings to account for approximately $2.2 billion in additional stock-based compensation expenses. The district court held an evidentiary hearing and, after evaluating the extensive briefing and evidence presented, issued an order suppressing all evidence reflecting Ruehle's statements to attorneys from Irell & Manella LLP ("Irell"), Broadcom's outside counsel, regarding the stock option granting practices at Broadcom. The court found that at the initial stages of the inquiry by Irell (called the "Equity Review") an attorney-client relationship also existed with the CFO individually, and not just with Broadcom, and that the lawyers breached their ethical duties to their client Ruehle in disclosing what he had told them in a preliminary interview.

The government filed an interlocutory appeal. We have jurisdiction pursuant to 18 U.S.C. § 3731, and we reverse and remand for further proceedings.

**I**

In March 2006, the *Wall Street Journal* published the first of a series of articles called "The Perfect Payday," which suggested that a number of public companies were backdating stock options granted to their employees.[1]  Shortly thereafter, in mid-May 2006, an investor rights group publicly identified Broadcom as one of the corporations that appeared to have engaged in backdating.  As a result of the media attention and in anticipation of an inquiry from the Securities and Exchange Commission ("SEC"), Broadcom's Board of Directors and company

---

[1] Stock options give individuals the right to buy shares of stock on a future date at a set price, commonly known as the "exercise" or "strike" price.  Typically, as was the practice at Broadcom, stock options granted to employees could not be exercised until the end of a fixed vesting period.  Once an option vested, the holder could exercise it and purchase stock from the company at the strike price.  Thus, options that have a strike price below the current trading price in the stock market are commonly referred to as being "in the money," whereas options with a strike price above the current trading price are considered "underwater."

The strike price is typically equal to the market price on the date that the option is granted.  "Backdating" refers to the practice of recording an option's grant date and strike price retrospectively. *See United States v. Reyes*, 577 F.3d 1069, 1073 (9th Cir. 2009).  The ability to manipulate the strike price maximizes the benefit to the option holders.  Selection of an initial grant date when the share price, and thus the strike price, is at its lowest during a given period will increase the amount an option is "in the money" or, in some cases, may determine whether an option is "in the money" at all, rather than "underwater."  In either case, the employee may immediately exercise the option to buy shares at the optimally low strike price, sell the stock at the current market price, and pocket any gain. "Backdating is not itself illegal, provided that the benefit to the employees is recorded on the corporate books as a non-cash compensation expense to the corporation, in accordance with an accounting convention promulgated in 1972 referred to as Accounting Principles Board Opinion No. 25." *Id.*

3

management decided to bring in outside counsel to commence an internal review of the company's current and past stock option granting practices. Ruehle, as Broadcom's CFO, was among those intimately involved in that decision from the outset. On May 18, 2006, Broadcom's Audit Committee engaged Irell, a private law firm with which it had longstanding ties, to conduct the Equity Review by investigating the propriety of the measurement dates utilized by Broadcom in its option granting process and identifying those grants which failed to meet the measurement date requirements of generally accepted accounting principles.[2] Irell immediately commenced its review, which entailed collecting corporate documents and records and conducting interviews with past and current Broadcom employees.

---

[2] The relationship between Broadcom and Irell runs deep, as Ruehle contends, and dates back to before 1998 when Irell assisted Broadcom in its initial public offering of stock ("IPO"), which led to its becoming an investor-owned public company. Irell itself acquired stock during the IPO and its partners profited handsomely when the stock price rose. Since then, Irell has represented Broadcom in relation to numerous acquisitions and the firm has handled several litigation matters for Broadcom and its officers and directors. At the time it was engaged to conduct the Equity Review, the firm was counsel of record for Broadcom and its management employees named as individual defendants in a then-unrelated securities class action, *Jin v. Broadcom Corp.*, pending in California state superior court. Moreover, Irell had recently represented Broadcom, as well as several of its officers and directors, including Ruehle, in an unrelated securities action referred to as the "warrants litigation." The warrants litigation settled several months prior, in December 2005.

4

Broadcom representatives, including Ruehle, met with Irell lawyers on May 24 and 25, 2006, to discuss the scope of the Equity Review. It was agreed that Irell would report the results of its inquiries to the Audit Committee. It was also decided that the Board would not appoint a panel of independent, outside directors to oversee the Equity Review. On May 26, 2006, a formal meeting of the Audit Committee was convened. Ruehle and other senior Broadcom executives, several members of the Board, and Irell lawyers were among those present. During the hour-long meeting, Irell partner David Siegel explained the nature of typical "backdating" investigations and discussed the status of Irell's internal review, including the necessary involvement of Broadcom's outside independent auditors, Ernst & Young LLP, who would have to review and opine on the accuracy of the company's audited financial statements and regulatory filings. Siegel also cautioned "that Irell can handle issues related to the proper accounting for option grants but that if an issue of self-dealing or management or Board integrity arose, a special committee of independent directors would need to be appointed and special independent counsel engaged to conduct that inquiry." The Audit Committee and other representatives of Broadcom made clear that the intent was to turn over the information obtained through the Equity Review to the auditors, to fully cooperate

5

with government regulators, and, if necessary, to self-report any problems with Broadcom's financial statements.

As many within Broadcom had anticipated, civil lawsuits soon followed the media reports about the company's backdating of stock options. On May 25, 2006, a shareholder derivative suit captioned *Murphy v. McGregor* was filed in California federal court. The following day, on May 26, the plaintiffs in the ongoing securities class action in California state superior court, *Jin v. Broadcom Corp.*, filed an amended complaint. Both the *Murphy* action and the *Jin* amended class action now alleged wrongdoing in relation to Broadcom's stock option granting practices; both suits named Broadcom and also personally named Ruehle, among other Broadcom officers and directors, as an individual defendant.

On May 30, 2006, Broadcom's in-house General Counsel David Dull sent an e-mail to various Broadcom employees, including Ruehle, notifying them of the *Murphy* action and of the amended complaint filed in the *Jin* securities class action. Dull invited anyone with concerns to contact either him or Irell attorneys Siegel, Kenneth Heitz, or Dan Lefler. Shortly after receiving Dull's message, Ruehle received a separate e-mail from Heitz, one of the Irell partners with whom Ruehle had already conferred as part of the Equity Review. Heitz's e-mail updated Ruehle concerning the scheduling of interviews of three current or former Broadcom

employees and, finally, inquired, "if you have open time on Thursday Dan Lefler and I would like to spend an hour or so with you . . . ."

As arranged, Heitz and Lefler met with Ruehle in his office on Thursday, June 1, 2006, to discuss Broadcom's stock option granting practices and his role as the company's CFO.[3] Ruehle had subsequent, brief discussions with the Irell lawyers as the Equity Review continued and the lawyers reported back to the CFO their progress in unearthing the facts. At no point did the topic of the civil securities lawsuits arise as it might relate to Ruehle personally. Nor did Ruehle ever indicate to the lawyers that he was seeking legal advice in his individual capacity. It is the substance of these June 2006 interactions that lies at the center of the present dispute.

---

[3] At the evidentiary hearing the Irell attorneys testified that they provided Ruehle a so-called *Upjohn* or corporate *Miranda* warning. Such warnings make clear that the corporate lawyers do not represent the individual employee; that anything said by the employee to the lawyers will be protected by the company's attorney-client privilege subject to waiver of the privilege in the sole discretion of the company; and that the individual may wish to consult with his own attorney if he has any concerns about his own potential legal exposure. *See Upjohn Co. v. United States*, 449 U.S. 383, 393–96 (1981). Ruehle testified that he did not recall receiving any such warnings. As discussed *infra*, the district court seems to have disbelieved the Irell lawyers who took no notes nor memorialized their conversation on this issue in writing, and it apparently credited Ruehle's testimony that no such warnings were given. We cannot say that this finding is clearly erroneous on the record before us.

7

In late June 2006, Irell advised Ruehle to secure independent counsel with respect to the investigations and the pending civil suits. Ruehle retained the law firm Wilson Sonsini Goodrich & Rosati to represent him individually. Nevertheless, Ruehle remained heavily involved in the company's internal review and he was privy to Irell's reports to the Audit Committee of its findings and ultimately the disclosures of the information gathered by Irell to Ernst & Young.

In August 2006, at Broadcom's direction, Irell fully disclosed the information obtained from the Equity Review to the Ernst & Young auditors. Irell had a series of meetings with Ernst & Young in which the lawyers reported what they had found, which necessarily included the substance of Ruehle's June 1, 2006, interview with Heitz and Lefler. Ruehle was present for at least some of these meetings between Irell and the Ernst & Young auditors. There is no dispute that the Irell lawyers regularly updated Ruehle and others in senior management about the progress of the Equity Review and their meetings and contacts with the auditors.

The Equity Review revealed several accounting irregularities with respect to certain stock option grants. In January 2007, on the advice of its outside counsel and auditors, Broadcom restated its earnings as reported in its financial disclosure

8

statements to include a total of $2.2 billion in previously undisclosed compensation expenses.

The SEC and the United States Attorney's Office commenced formal enforcement and grand jury investigations of several company executives in relation to Broadcom's stock option granting practices. In May and June 2007, with Broadcom's authorization, government investigators interviewed Irell attorneys Heitz and Lefler by telephone regarding their conversations with Ruehle in June 2006. The information they provided was summarized in FBI Form FD-302 reports of investigation, which are part of the sealed record. When he learned that the government intended to use this information against him in connection with possible criminal charges, Ruehle objected and claimed that any statements to the Irell attorneys were protected by his attorney-client privilege. Ruehle also insisted, after the fact, that whatever he said to Irell could not be disclosed without his prior written consent.

On June 4, 2008, a grand jury in the Central District of California indicted Ruehle and Henry T. Nicholas III—Broadcom's founder, and former President and Chief Executive Officer—on charges of conspiracy, securities and wire fraud, and various other violations of Title 15 of the United States Code. The indictment alleges that beginning in or around 1999 and continuing until at least in or around

9

2005, Nicholas and Ruehle, among others, engaged in a fraudulent scheme and conspiracy to disguise, conceal, understate, and mischaracterize compensation expenses Broadcom was required to recognize in connection with granting its stock options to various employees. Among the allegations of wrongdoing, the indictment claims that as part of the backdating scheme the defendants paid a former employee who threatened to expose the scheme, concealed the payoff from Broadcom's Board and its independent auditors, and took various steps to create plausible deniability as to Broadcom's option backdating practices.

On January 12, 2009, the government moved *ex parte* for a hearing to resolve whether the statements Ruehle made to Irell lawyers in June 2006 were privileged communications. Ruehle argued that he had an individual attorney-client relationship with Irell arising from the securities lawsuits, in which he was a named defendant. Beginning on February 23, 2009, the district court held a three-day evidentiary hearing at which Ruehle and Irell attorneys Heitz and Lefler testified. At Ruehle's request, a substantial portion of the testimony and evidence was received *in camera* outside the presence of the federal prosecutors. Both Irell attorneys insisted that Irell's individual representation of Ruehle in relation to the

civil securities lawsuits did not commence until after the June 1, 2006, interview.[4]

Among other things, the attorneys testified that they began the June 2006 meeting with a so-called *Upjohn* or corporate *Miranda* warning, which included notice that the Irell attorneys were acting as representatives of Broadcom—specifically, the Audit Committee—and that the privilege therefore rested only with the company. Ruehle, however, denied any recollection of receiving such cautionary warnings at the June 1, 2006, interview. Ruehle testified that at the time he spoke with Heitz and Lefler he believed Irell represented everyone named in the civil suits, including him, and that Heitz and Lefler were acting at least in part as his personal attorneys during the interview.

At the conclusion of the hearing, the district court rendered its oral ruling which strongly condemned the Irell attorneys' behavior with respect to the firm's handling of the Equity Review. The court then found that Ruehle "had a reasonable belief that Irell and Manella were his lawyers prior to the June 1, 2006 interrogation by Irell, and that he never gave informed written consent, either to the dual representation by Irell or the disclosure of privileged information to third

---

[4] On June 8, 2006, Irell filed a Status Conference Report on behalf of all defendants in the *Jin* class action and shortly thereafter accepted service of the amended complaint in order to avoid the need for service of legal process on each person named therein, including Ruehle.

parties, including Ernst & Young and the government." Based on this reasoning, the court ordered suppression. The district court subsequently issued a written order, which included an additional finding that Ruehle intended his statements to Heitz and Lefler to be confidential. The order stated that "all evidence reflecting Mr. Ruehle's statements to Irell regarding the stock option granting practices at Broadcom is suppressed."[5] The court also referred Irell to the California State Bar for possible discipline in light of numerous perceived violations of state rules of professional conduct.

The government interlocutorily appealed the district court's suppression order and we consider it on an expedited basis.[6]

---

[5] The order also directed the government to return all privileged documents within 14 days. That order is stayed pending the outcome of this appeal.

[6] The district court and the parties label this a matter of "suppression." We will do so as well for the sake of consistency. However, analytically, the court's order is more accurately characterized as an order directing the exclusion of privileged evidence—akin to the grant of a motion *in limine*. Though courts in the past have used terms such as "suppress" and "exclude" interchangeably in similar contexts, *see, e.g.*, *United States v. Plache*, 913 F.2d 1375, 1377, 1379–81 (9th Cir. 1990), "suppress" is better confined to a narrower meaning that would not apply here. "The attorney-client privilege is an evidentiary rule designed to prevent the forced disclosure in a judicial proceeding of certain confidential communications between a client and a lawyer." *United States v. Rogers*, 751 F.2d 1074, 1077 (9th Cir. 1985). In contrast, "suppression" is generally understood to concern invocation of the judicially created exclusionary rule, which is intended to operate as a deterrent to governmental misconduct and, as a necessary corollary, may be

(continued...)

12

## II

The district court's conclusion that statements are protected by an individual attorney-client privilege is "a mixed question of law and fact which this court reviews independently and without deference to the district court." *United States v. Bauer*, 132 F.3d 504, 507 (9th Cir. 1997) (quoting *United States v. Gray*, 876 F.2d 1411, 1415 (9th Cir. 1989)). That is, whether the party has met the requirements to establish the existence of the attorney-client privilege is reviewed de novo. *Id.* We also review de novo the district court's rulings on the scope of the attorney-client privilege. *Id.* Factual findings are reviewed for clear error. *See Al-Haramain Islamic Found. v. Bush*, 507 F.3d 1190, 1196 (9th Cir. 2007). A district court's credibility determinations are given "special deference." *United States v. Craighead*, 539 F.3d 1073, 1082 (9th Cir. 2008) (citing *United States v. Nelson*, 137 F.3d 1094, 1110 (9th Cir. 1998)).

## III

---

[6](...continued)
invoked to exclude other evidence discovered as the "fruit of the poisonous tree." *See Herring v. United States*, 129 S. Ct. 695, 700 (2009). There is no allegation of government misconduct in the instant case as the record reveals there was no governmental participation in the acts of Broadcom, the Audit Committee, or Irell's conduct of the Equity Review. Thus, the exclusionary rule does not apply here and "suppression" in that sense is not at issue.

The government raises several arguments challenging the district court's order excluding Ruehle's statements to Irell attorneys. We begin with some basic premises. First, there is no dispute that Broadcom had an existing attorney-client relationship with Irell and, by electing to reveal the information gathered to Ernst & Young (and later to various agencies of the United States), deliberately waived any corporate attorney-client privilege it held with respect to all matters at issue. Second, the Equity Review and the civil securities suits, to which Ruehle was a party, both concerned the same general subject matter as of June 1, 2006—i.e., the stock option granting practices of Broadcom. Finally, the district court concluded as a fact that Ruehle reasonably believed that Irell represented him individually with respect to the ongoing civil lawsuits when the June 1, 2006, meeting took place. Because this factual finding is not clearly erroneous, we approach the parties' arguments from the perspective that Irell had attorney-client relationships with both Broadcom and Ruehle individually.

We, however, must inquire further. After all, "[a] party asserting the attorney-client privilege has the burden of establishing the relationship *and* the privileged nature of the communication." *Bauer*, 132 F.3d at 507 (citing *Ralls v. United States*, 52 F.3d 223, 225 (9th Cir. 1995)) (emphasis added); *accord In re Grand Jury Subpoenas*, 144 F.3d 653, 659 (10th Cir. 1998) ("In certain

14

circumstances, reasonable belief may be enough to create an attorney-client *relationship*, but it is not sufficient here to create a *personal* attorney-client *privilege*.").  We must determine whether Ruehle's communications to the Irell attorneys regarding Broadcom's stock option granting practices are protected by a personal attorney-client privilege belonging to Ruehle.

"The attorney-client privilege protects confidential disclosures made by a client to an attorney in order to obtain legal advice, . . . as well as an attorney's advice in response to such disclosures."  *Bauer*, 132 F.3d at 507 (quoting *United States v. Chen*, 99 F.3d 1495, 1501 (9th Cir. 1996)) (emphasis omitted).  "The fact that a person is a lawyer does not make all communications with that person privileged."  *United States v. Martin*, 278 F.3d 988, 999 (9th Cir. 2002) (citing *Chen*, 99 F.3d at 1501).  "Because it impedes full and free discovery of the truth, the attorney-client privilege is strictly construed."  *Id.* (quoting *Weil v. Inv./Indicators, Research & Mgmt., Inc.*, 647 F.2d 18, 24 (9th Cir. 1981); *accord United States v. Plache*, 913 F.2d 1375, 1379 (9th Cir. 1990).  "[T]he privilege stands in derogation of the public's 'right to every man's evidence' and as 'an obstacle to the investigation of the truth,' [and] thus, . . . '[i]t ought to be strictly confined within the narrowest possible limits consistent with the logic of its principle.'"  *In re Horowitz*, 482 F.2d 72, 81 (2d Cir. 1973) (citations omitted).

15

Typically, an eight-part test determines whether information is covered by the attorney-client privilege:

> (1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) unless the protection be waived.

*In re Grand Jury Investigation*, 974 F.2d 1068, 1071 n.2 (9th Cir. 1992) (quoting

*United States v. Margolis (In re Fischel)*, 557 F.2d 209, 211 (9th Cir. 1977)).[7] The

---

[7] The government urges that the special problems presented by joint representation of a corporation and its individual officers counsel adoption of particularized requirements before the individual officer could assert an attorney-client privilege. The Third Circuit in *In re Bevill, Bresler & Schulman Asset Mgmt. Corp.*, 805 F.2d 120, 123–24 (3d Cir. 1986), adopted a five-factor test intended to clarify that "any privilege that exists as to a corporate officer's role and functions within a corporation belongs to the corporation, not the officer." Several other circuits have adopted some form of tailored test for joint-representation scenarios. *See Ross v. City of Memphis*, 423 F.3d 596, 605 (6th Cir. 2005)*; In re Grand Jury Subpoena (Newparent)*, 274 F.3d 563, 571–72 (1st Cir. 2001); *In re Grand Jury Subpoenas*, 144 F.3d 653, 659 (10th Cir. 1998); *United States v. Int'l Bhd. of Teamsters*, 119 F.3d 210, 215–16 (2d Cir. 1997). We do not decide the propriety of adopting the specialized test of *Bevill* because, given Irell's longstanding representation of Ruehle as an individual before the instant case arose and in light of the planned disclosure of facts gained in the Equity Review to the third-party independent auditor, this case can be resolved using our usual eight-part test. Accordingly, we leave for another day consideration of the extraordinary requirements of the *Bevill* five-prong test for establishing attorney-client privilege in a situation where both the executive and the corporation assert that they are dually represented. Similarly, we need not reach and decide in this case whether our circuit should adopt the rule of *Newparent*: that the corporation, without consent of an executive asserting privilege, can waive the attorney-client privilege

(continued...)

16

party asserting the privilege bears the burden of proving each essential element. *United States v. Munoz*, 233 F.3d 1117, 1128 (9th Cir. 2000).

## A

At the outset we note a fundamental flaw in the district court's analysis. "Issues concerning application of the attorney-client privilege in the adjudication of federal law are governed by federal common law." *Bauer*, 132 F.3d at 510 n.4 (quoting *Clarke v. Am. Commerce Nat. Bank*, 974 F.2d 127, 129 (9th Cir. 1992)); *see also United States v. Blackman*, 72 F.3d 1418, 1423 (9th Cir. 1995) ("[S]ince the adoption of the Federal Rules of Evidence, courts have uniformly held that federal common law of privilege, not state law applies." (citations omitted)). The district court, however, applied a "reasonable belief" standard without ever referencing the well-established eight-part test. Rather, in reaching its holding, the court relied almost exclusively upon California state law to define both the attorney-client relationship and the attorney-client privilege. Most significantly, the court cited California Evidence Code section 917(a) for the proposition that all

---

[7](...continued)
in a dual-representation context where the subject matter of the waiver concerns matters of interest to the corporation. 274 F.3d at 572–74. We also need not reach *Newparent*'s further holding that the executive can control the assertion of attorney-client privilege only as to matters segregable from those of concern to the corporation. *Id.* at 573.

17

"communications made in the course of an attorney-client relationship are presumed confidential."[8]

This legal error is critical in this case. The district court applied a liberal view of the privilege that conflicts with the strict view applied under federal common law, which governs here. *See Martin*, 278 F.3d at 999. By approaching the exclusion question with a presumption that the privilege attached, the district court inverted the burden of proof, improperly placing the onus on the government to show what information was not privileged. *See Gordon v. Superior Court of L.A. County*, 65 Cal. Rptr. 2d 53, 59 (Cal. Ct. App. 1997) ("[C]ommunications between a lawyer and his client are presumed confidential, with the burden on the party seeking disclosure to show otherwise." (citations omitted)).

As the party asserting the privilege, Ruehle was obliged by federal law to establish the privileged nature of the communications and, if necessary, to

---

[8] Ruehle insists that federal privilege law also creates a *prima facie* presumption of privilege, citing *Chen*, 99 F.3d 1495. He misreads that opinion. At issue in *Chen* was whether the defendants' attorneys were acting in the capacity of professional legal advisors—that is, whether the attorneys were providing legal advice, which is privileged, or non-legal business advice, which is not protected. *Id.* at 1500–01 (noting that "[i]f a person hires a lawyer for advice, there is a rebuttable presumption that the lawyer is hired 'as such' to give 'legal advice'"). Ruehle extrapolates from the unremarkable and narrow principle in *Chen* to argue that "[w]here an attorney-client relationship exists, communications made in the context of that relationship are *prima facie* subject to the privilege." This argument directly conflicts with our case law.

18

segregate the privileged information from the non-privileged information.  *See*

*Bauer*, 132 F.3d at 507; *see also* 3 Jack B. Weinstein & Margaret A. Berger,

*Weinstein's Federal Evidence*, § 503.20[4][b] (Joseph M. McLaughlin, ed.,

Matthew Bender 2d ed. 2009) (discussing rule that blanket claims of privilege are

generally disfavored).  With respect to the latter obligation, Ruehle has made no

effort to identify with particularity which of his communications to the Irell

attorneys are within his claim of privilege, in either his public or sealed filings

before us.  Under federal law, the attorney-client privilege is strictly construed.

Ruehle's failure to define the scope of his claim of privilege weighs in favor of

disclosure; in any event, his claim cannot support the overly broad, blanket

suppression order entered here.

**B**

With the burden properly on Ruehle, and after carefully reviewing and

evaluating the record, we hold that Ruehle fails the fourth element of the traditional

eight-part privilege test.  Ruehle's statements to the Irell attorneys were not "made

in confidence" but rather for the purpose of disclosure to the outside auditors.  That

he might regret those statements after later learning of the subsequent corporate

disclosure to law enforcement officials is not material to the privilege

determination as of June 2006.

19

The district court reached the contrary conclusion: "Mr. Ruehle intended his statements to be confidential, and he had no reason to suspect that his conversations with the Irell lawyers would be disclosed to third parties." We are unable to square this factual finding, which forms the linchpin of the suppression order, with the evidence presented at the evidentiary hearing. The notion that Ruehle spoke with Irell attorneys Heitz and Lefler with the reasonable belief that his statements were confidential is unsupported by the record. Of particular significance is what was said in the meetings he attended prior to June 1, 2006, with Irell attorneys, company management, and the Audit Committee, as acknowledged in Ruehle's own testimony. He frankly admitted that he understood the fruits of Irell's searching inquiries would be disclosed to Ernst & Young in order to convince the independent auditors of the integrity of Broadcom's financial statements to the public, or to take appropriate accounting measures to rectify any misleading reports. We reject the district court's contrary finding that an expectation of confidentiality was established because, upon review of the record, we are left with the "definite and firm conviction that a mistake has been committed" and thus we determine that this factual finding was clearly erroneous. *United States v. Overton*, 573 F.3d 679, 688 (9th Cir. 2009) (quoting *Easley v. Cromartie*, 532 U.S. 234, 242 (2001)).

20

Ruehle was no ordinary Broadcom employee. He served as the public company's CFO—the senior corporate executive charged with primary responsibility for Broadcom's financial affairs. This was a sophisticated corporate enterprise with billions of dollars in sales worldwide, aided by accountants, lawyers, and advisors entrusted with meeting a multitude of regulatory obligations. The duties undertaken by Ruehle broadly encompassed not only accurately and completely reporting the company's historical and current stock option granting practices, but also Broadcom's strict compliance with reporting and record keeping requirements imposed through the Securities Exchange Act of 1934 and the Sarbanes-Oxley Act of 2002, among many other federal and state rules and regulations. *See, e.g.*, 15 U.S.C. §§ 7241, 7262(a). As the head of finance, Ruehle cannot now credibly claim ignorance of the general disclosure requirements imposed on a publicly traded company with respect to its outside auditors or the need to truthfully report corporate information to the SEC.

Ruehle was also intimately involved in all aspects of the Equity Review, including the planning, investigatory, and disclosure stages. Ruehle was a full participant in the initial May 2006 meetings with the Irell attorneys where the scope of representation and the details of the Equity Review were decided and agreed upon, even before convening the formal Audit Committee meeting. From

21

the outset, it was settled and made widely known to senior management that Broadcom intended to fully cooperate with the SEC and the auditors. Ruehle, as the primary contact with Ernst & Young over the years, personally introduced the Irell attorneys to the team of outside auditors. Thereafter, he repeatedly met with the Audit Committee, senior management, the Irell attorneys, and the auditors, and remained fully apprised throughout the summer of 2006 of the status of Irell's investigation and the flow of information.

In his testimony at the evidentiary hearing, Ruehle acknowledged the broad nature of the planned third-party disclosure, noting that Irell was directed, to his knowledge, to freely share "all factual information" gleaned through the Equity Review—whether "good, bad, or ugly." As he explained, at the time of the June 1, 2006, interview, he understood that nothing would be withheld from Ernst & Young:

> Q:     Did you think it was appropriate for Broadcom, represented by Irell . . . , to withhold information from the auditors in connection with their work in early June of 2006?
>
> A:     We were not withholding information from the auditors.
>
> Q.     They were not withholding information from the auditors; is that correct?
>
> A:     That's correct.

Q:     And you understood that to be the case at the time; correct?

A:     That's correct.

Indeed, Ruehle confirmed over and over again his awareness that the substance of his June 2006 interviews with the Irell lawyers was not to be held in confidence:

Q:     You understood that Irell was going to be sharing the factual information they gathered to third parties?

A:     That's correct.

Q:     And fair to say you understood that Irell was there, among other things, to gather facts; correct?

A:     Correct.

To dispel any doubt, Ruehle also confirmed that the information he provided to Heitz and Lefler was largely factual in nature—the type of information he understood would be disclosed to third parties.

Q:     To be clear, the information you provided to Irell was factual information; correct?

A:     It was a combination of factual information and some assumptions and some recollections.

* * *

Q:     And you understood that Ernst & Young was going to be looking to you, among other people, to help them understand what had happened as part of Broadcom's historical options review; correct?

A:     That's correct.

23

As Ruehle anticipated when he met with the Irell attorneys in June 2006, the information obtained through the Equity Review, including his input, was passed on to Ernst & Young. He never raised any anxiety about the possible disclosure over what he now claims was intended to be confidential and thus privileged information. Ruehle had ample opportunity to raise any concern he might have harbored. Ruehle not only attended meetings where the Audit Committee directed Irell to disclose to Ernst & Young the fruits of the Equity Review, he was also present at meetings where disclosures to the auditors actually occurred. He did not object. Even after engaging independent counsel to apprise him of his legal rights, Ruehle never claimed that he thought his statements to Irell during the Equity Review, later shared with the auditors, were confidential—until the specter of criminal liability arose in 2008.

On appeal, Ruehle tries to minimize the damning evidence confirming his awareness that his interactions with Irell would not be held in confidence. He places much weight on the assertion that he only learned of the details of Irell's disclosures to Ernst & Young and the government in 2008 and that he was "shocked." Ruehle contends that, notwithstanding his obligation to fully cooperate in Broadcom's internal review, he would not have provided information as part of the Equity Review had he known it could be used in support of a criminal

24

investigation or an SEC enforcement action. The district court seems to have agreed with Ruehle's analysis, noting:

> The Government argues that Mr. Ruehle knew that Irell would make some disclosure to Ernst & Young in connection with its investigation, and therefore Mr. Ruehle knew that his statements were not confidential. This argument is unpersuasive. Mr. Ruehle never understood that Irell might disclose statements adverse to Mr. Ruehle's interests to the Government for use in a criminal case against him.

This analysis misses the mark. The salient point from a privilege perspective is that Ruehle readily admits his understanding that all factual information would be communicated to third parties, which undermines his claim of confidentiality to support invoking the privilege. Ruehle's subjective shock and surprise about the subsequent usage of the information he knew would be disclosed to third-party auditors—e.g., information subsequently shared with securities regulators and the Justice Department now used to support a criminal investigation and his prosecution—is frankly of no consequence here.

In support of his case for invocation of the privilege, Ruehle also repeatedly points to attorney Heitz's testimony that he could not "split his mind" so as to distinguish between facts relevant to the Equity Review and those relevant to the defense of Ruehle in the pending civil securities litigation, because they both had at their core Broadcom's stock option granting practices. But his efforts to make

25

gold from lead are met with failure. The implicit concession on Ruehle's part—that the information underlying the Equity Review and the lawsuits was largely inseparable, if not one and the same—is detrimental, not helpful, to his case. His admitted awareness that anything relating to the former would not be held in confidence but rather shared with at least one third party destroys the confidentiality essential to establishing the privilege as to both.

Ruehle attempts to raise an exception to the full disclosure of all factual information, insisting that he anticipated the disclosure of only factual information "that was not otherwise privileged information." In other words, Ruehle now asserts an expectation of confidentiality only over statements that he claims were really given in confidence. He does not distinguish what those statements might be in his blanket invocation of the privilege. This circular reasoning is, analytically speaking, unpersuasive and cannot overcome the concrete evidence in the record before us. Even supposing he subjectively believed that *some* of the information he conveyed to the Irell lawyers was confidential, upon asserting the attorney-client privilege Ruehle was obliged to distinguish which particular statements should be afforded the privilege. He made no effort to do so before the district court and fares no better on appeal. His testimony at the evidentiary hearing, despite being held *in camera* at his request, due ostensibly to the sensitive subject

26

matter to be discussed, did not delve into the details of his substantive contributions to the Equity Review and, frankly, entailed largely non-privileged matters. We are left guessing as to what particular facts Ruehle purportedly believed were disclosed in breach of confidence.

Ruehle's position is, at bottom, that some nebulous portion of his communications with Heitz and Lefler was intended to be confidential as to him personally and therefore everything said or not said to the attorneys should be protected by his individual attorney-client privilege. That is not the law nor, in our view, should it be. Having failed to better articulate his expectations regarding the scope of disclosure to Ernst & Young, he has failed to carry his burden with respect to any and all factual information arising from the Equity Review.

Moreover, Ruehle's argument runs squarely into the settled rule that *any* voluntary disclosure of information to a third party waives the attorney-client privilege, regardless of whether such disclosure later turns out to be harmful. *See* 3 Weinstein & Berger, *supra*, § 503.40. Ruehle freely and voluntarily disclosed the information in June 2006 and did not mention an individualized privilege until nearly two years later, after having sat in on the very meetings where his allegedly-privileged information was disclosed. Ruehle's assertion about his subjective intent in 2006 cannot sustain his privilege claim when he has freely admitted that

27

the disclosure to Ernest & Young was planned. *See Weil*, 647 F.2d at 24 (holding subjective intent not dispositive and privilege waived).

In sum, the overwhelming evidence demonstrates that Ruehle's statements to Heitz and Lefler were not "made in confidence" but rather for the purpose of outside disclosure. Accordingly, we hold that Ruehle has failed to meet his burden of establishing the existence of an individual attorney-client privilege with respect to the information provided to the Irell attorneys in the June 2006 time frame.

## IV

A considerable portion of the district court's suppression order was dedicated to recounting perceived violations of the California Rules of Professional Conduct committed by Irell attorneys. This portion of the order, which relates to possible disciplinary action by the state bar, is not before us on appeal. Ruehle, however, asserts that clear breaches of professional duties warrant suppression in a criminal prosecution. We disagree and reject this novel argument, which stands apart from the attorney-client privilege determination.[9]

"[A] state rule of professional conduct cannot provide an adequate basis for

---

[9] At the evidentiary hearing, Ruehle's counsel acknowledged that suppression was *not* a remedy for a breach of counsel's duty of loyalty. Ruehle reversed course and argued otherwise in his briefs on appeal. He appears to have abandoned the position at oral argument.

a federal court to suppress evidence that is otherwise admissible." *United States v. Lowery*, 166 F.3d 1119, 1124 (11th Cir. 1999); *accord United States v. Keen*, 508 F.2d 986, 989 (9th Cir. 1974) ("[E]vidence obtained in violation of neither the Constitution nor federal law is admissible in federal courts, even though obtained in violation of state law." (citations omitted)). To be clear, in some cases, material protected by the attorney-client privilege may come to light as a result of counsel's breach of a duty of confidentiality. But it is the protected nature of the information that is material, not the ethical violation by counsel. *See Int'l Bhd. of Teamsters*, 119 F.3d at 217 (holding that an individual could not assert individual privilege even though the law firm failed to clarify that it represented only his employer, in violation of state rules of professional responsibility).

Contrary to Ruehle's contention, *United States v. Rogers*, 751 F.2d 1074 (9th Cir. 1985), provides him no support. As the government correctly distinguishes it, *Rogers* involved government misconduct in acquiring evidence. *Id.* at 1079 (holding that a federal agent's "inducement of a violation of an ethical obligation of confidentiality . . . does not warrant dismissal of an indictment" where suppression is a possible remedy with respect to the improperly obtained evidence). Read properly, that case supports the government's position that the suppression order was in error. *Id.* at 1077 ("The attorney-client privilege is an

evidentiary rule designed to prevent the forced disclosure in a judicial proceeding of certain confidential communications between a client and a lawyer."). There has been no allegation that the government encouraged, was complicit in, or was even aware of, any breach of ethical obligations on Irell's part. It learned of the information only after Broadcom made an intentional disclosure to the government in response to regulatory inquiries as evidence of the company's good faith efforts to comply with its financial reporting obligations. Irell's allegedly unprofessional conduct in counseling Broadcom to disclose, without obtaining written consent from Ruehle, while troubling, provides no independent basis for suppression of statements he made in June 2006.

## V

The district court erred in forbidding the United States from calling Irell attorneys to testify to the information they learned from Ruehle in June 2006. Consistent with his admitted understanding that Broadcom would fully disclose what Irell learned as part of the Equity Review to Ernst & Young, Ruehle lacks an expectation of confidentiality to support a blanket invocation of his individual attorney-client privilege over *all* factual information he provided.[10]

---

[10] We stress that our holding today should not be interpreted as carte blanche approval of all foreseeable testimony by the Irell attorneys as we read the proffer

(continued...)

30

The district court's order suppressing the Irell evidence is reversed and the

matter is remanded for trial.

**REVERSED** and **REMANDED**.

---

[10](...continued)
summarized in the FBI Form FD-302 reports.  The district court remains
responsible for determining the admissibility of any testimony that may extend
beyond factual information, and, to the extent consistent with our opinion,
appropriate evidentiary objections, of course, remain viable.

## COUNSEL

Daniel B. Levin (argued), Gregory W. Staples, Andrew D. Stopler, United States Attorney's Office, Los Angeles, California; Robb C. Adkins, United States Attorney's Office, Santa Ana, California; Thomas P. O'Brien, United States Attorney, for Plaintiff-Appellant United States of America.

Matthew D. Umhofer (argued), Richard Marmaro, Matthew E. Sloan, Skadden, Arps, Slate, Meagher & Flom LLP, Los Angeles, California, for Defendant-Appellee William J. Ruehle.