# Supreme Court of Texas

---

No. 21-0534

---

The University of Texas System,

*Petitioner,*

v.

The Franklin Center for Government and Public Integrity
and Jon Cassidy,

*Respondents*

---

On Petition for Review from the
Court of Appeals for the Third District of Texas

---

JUSTICE DEVINE, joined by Justice Boyd, dissenting.

"Privileges 'represent society's desire to protect certain relationships.'"[1] "[T]he oldest," "most venerated," and "most sacred of all legally recognized privileges" is the attorney–client privilege.[2] By promoting open dialogue between legal counsel and client, the privilege "promote[s] broader public interests in the observance of law and

---

[1] *Paxton v. City of Dallas*, 509 S.W.3d 247, 259 (Tex. 2017) (quoting *Republic Ins. Co. v. Davis*, 856 S.W.2d 158, 163 (Tex. 1993)).

[2] *Id.* (quoting *United States v. Edwards*, 303 F.3d 606, 618 (5th Cir. 2002), and *United States v. Bauer*, 132 F.3d 504, 510 (9th Cir. 1997)).

administration of justice."[3]  But because the privilege conceals the truth, it carries a significant cost.  To balance these conflicting interests, the attorney–client privilege is limited to a defined set of circumstances and construed "narrowly."[4]

Our evidentiary rules extend the privilege only to confidential communications between lawyer and client—or their respective representatives—"made to facilitate the rendition of professional legal services."[5]  Merely communicating with a licensed attorney does not suffice because lawyers, especially in-house lawyers, can wear both legal and nonlegal hats.[6]  For that reason, even when a client employs a licensed attorney, questions about what communications fall under the privilege's umbrella can be murky.[7]  When a client contracts with a

---

[3] *Id.* at 260 (quoting *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981)).

[4] *In re XL Specialty Ins. Co.*, 373 S.W.3d 46, 49, 56 & n.20 (Tex. 2012) (citing and quoting *Hyman v. Grant*, 112 S.W. 1042, 1044 (Tex. 1908), for the proposition that, "[a]s the rule of privilege has a tendency to prevent the full disclosure of the truth, it should be limited to cases which are strictly within the principle of the policy that gave it birth").

[5] TEX. R. EVID. 503(b)(1); *see generally* TEX. R. EVID. 503 (setting the general rule, providing exceptions, and defining the key terms "client," "client's representative," "lawyer," "lawyer's representative," and "confidential").

[6] RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 73 cmt. i (Am. L. Inst. 2000) (while the privilege applies "without distinction to lawyers who are inside legal counsel or outside legal counsel for an organization," "[c]ommunications predominantly for a purpose other than obtaining or providing legal services for the organization are not within the privilege").

[7] *Id.* § 72 cmt. c ("A client must consult the lawyer for the purpose of obtaining legal assistance and not predominantly for another purpose. . . . Whether a purpose is significantly that of obtaining legal assistance or is for a nonlegal purpose depends upon the circumstances . . . .  If a lawyer's services

*nonlawyer* to provide services—as in this case[8]—concerns about the privilege's application are at an apex. Due to the increasingly complex legal landscape, nonlawyer consultants can certainly play a critical and significant role in a lawyer's rendition of professional legal services,[9] but the potential for misusing the privilege exists absent a clear nexus between the consultant's services and a lawyer's provision of legal services to the client. Because a nonlawyer cannot provide legal advice, a "significant purpose" for the engagement must be to assist a lawyer in rendering professional legal services, and that purpose must exist contemporaneously with the communications.[10]

Applying that understanding of what it means to be "employed . . . to assist in the rendition of professional legal services,"[11] I would hold that the attorney–client privilege did not attach to Kroll's investigation or was waived due to insufficient contemporaneous substantiation that Kroll's audit of UT's admissions practices was initiated or conducted to assist UT's attorneys or its general counsel, Daniel Sharphorn, in providing legal advice to UT. At best, the record

---

are of a kind performed commonly by both lawyers and nonlawyers or that otherwise include both legal and nonlegal elements, difficult questions of fact may be presented.").

[8] *See infra* note 22.

[9] RESTATEMENT, *supra* note 6, at § 70 cmt. g ("The privilege also extends to communications to and from the client that are disclosed to independent contractors retained by a lawyer, such as an accountant or physician retained by the lawyer to assist in providing legal services to the client and not for the purpose of testifying.").

[10] *See id.* §§ 70 cmt. g, 72 cmt. c, 73 cmt. i; *see also* TEX. GOV'T CODE §§ 81.101(a), .102(a) (prohibiting nonlawyers from providing legal advice).

[11] *See* TEX. R. EVID. 503(a)(4)(A), (b)(1).

3

supports the conclusion that UT sought advice and guidance *from Kroll*, which was acting independently in advising UT about its admissions practices and policies. The Court's contrary conclusion turns on equivocal contractual clues and post hoc affidavits that are self-serving, conclusory, and—most importantly—provide no factual basis for concluding Kroll was engaged to assist UT's lawyers in the provision of legal services. While the Court adopts the "significant purpose" standard,[12] as I would, the overly generous application here erroneously denies public access to public information. I respectfully dissent because the paltry evidentiary record does not support the conclusion that Kroll was engaged to assist UT's lawyers in providing legal services.

## A

Under our representative form of government, the people's delegation of authority to public servants does not include "the right to decide what is good for the people to know and what is not good for them to know."[13] This fundamental principle of open government is embodied in the Public Information Act (PIA), which declares "as the policy of this state," that "each person is entitled . . . to complete information about the affairs of government and the official acts of public officials and employees" "at all times" "unless otherwise expressly provided by law."[14]

But while the PIA comprehensively "promotes and advances the public's interest in governmental transparency and openness," the statute simultaneously recognizes the public's compelling interest in

---

[12] *Ante* at 10.

[13] TEX. GOV'T CODE § 552.001(a).

[14] *Id.*

4

"shielding some information from public disclosure."[15]   Within the statute's balancing framework, a "completed report, audit, evaluation, or investigation" made for "a governmental body" is a category of "public information" that may not be secreted from the public unless the information is "made confidential under [the PIA] or other law."[16] "Other law" includes the common-law attorney–client privilege, as memorialized in the Texas Rules of Evidence.[17]   When the privilege applies, the right of public access to public information must yield to "the public's equally significant interest in ensuring public officials pursue and obtain legal advice and representation in affairs of governance."[18]

The inherent—and irreconcilable—tension between public access and the need for confidentiality is amplified in open-government disputes because "[f]ull and frank legal discourse" between attorneys and their governmental clients "directly and significantly serves the public interest,"[19] but at the same time, the information being withheld from the public *belongs to the public*.   The "conflict between the desire for openness and the need for confidentiality in attorney–client

---

[15] *Paxton v. City of Dallas*, 509 S.W.3d 247, 249-50, 270 (Tex. 2017).

[16] TEX. GOV'T CODE § 552.022(a)(1).   The final investigative report in this case has already been released to the public, but section 552.022(a)(1) is not limited to a "report," and there appears to be no dispute that the communications Kroll reviewed or drafted in connection with the completed "investigation" or "audit" are "public information."

[17] TEX. R. EVID. 503 (attorney–client privilege); *In re City of Georgetown*, 53 S.W.3d 328, 336 (Tex. 2001) (holding that the Texas Rules of Evidence are "other law" for purposes of determining whether public information is confidential and exempted from disclosure under PIA section 552.022(a)).

[18] *Paxton*, 509 S.W.3d at 270.

[19] *Id.* at 250, 260.

5

relations" requires courts to "restrict[] the scope of the attorney–client privilege"[20] by construing the privilege "narrowly."[21]

The issue here is the proper scope of the attorney–client privilege in a nonlitigation case that does not involve communications with a lawyer, an employee of a lawyer, or even someone working under a lawyer's supervision and control.[22]  The nub of this dispute is whether the attorney–client privilege applies to communications UT officials,

---

[20] *In re XL Specialty Ins. Co.*, 373 S.W.3d 46, 49 (Tex. 2012) (quoting *Republic Ins. Co. v. Davis*, 856 S.W.2d 158, 160 (Tex. 1993)).

[21] *Id.* at 56; *see Hyman v. Grant*, 112 S.W. 1042, 1044 (Tex. 1908).

[22] The contract is between "The University of Texas System" as the "Client" and "Kroll Associates, Inc." as the "Contractor."  No attorney is named or identified as a party or signatory to either the contract or Kroll's final report. UT has never asserted that Kroll, an incorporated entity, is "authorized . . . to practice law in any state or nation" or that Kroll employed lawyers to provide legal services to UT.  *See* TEX. R. EVID. 503(a)(3) (defining "lawyer" for the attorney–client privilege).  If Kroll were actually engaged to provide services as an attorney, the contract would be unlawful.  By law, state agencies (including university systems) "may not retain or select any Outside Counsel without first receiving authorization and approval from the Office of the Attorney General," which will sign the contract and "indicate [its] approval on the contract."  1 TEX. ADMIN. CODE §§ 57.1(1), .3(a), .5(a), (g); *see* TEX. GOV'T CODE § 402.0212(a).  Kroll's engagement contract does not meet these requirements.

In addition, the consulting agreement between UT and Kroll expressly states that "[Kroll] is an independent contractor" and "not a state employee, partner, joint venturer, or agent of University."  These circumstances distinguish the facts here from UT's primary authority, *Upjohn Co. v. United States*, in which communications were made by company employees to company attorneys during an attorney-led internal investigation that was undertaken to ensure the company's "compliance with the law," 449 U.S. 383, 386-87, 392, 394 (1981), and *In re Kellogg Brown & Root, Inc.*, 756 F.3d 754, 757 (D.C. Cir. 2014), in which a business client initiated an internal investigation by its in-house legal department, acting in its legal capacity, after being informed of potential misconduct.

employees, and legal counsel shared with a nonlawyer consultant that UT itself retained to conduct an "independent" audit or investigation of UT's admission practices. The question is not whether the communications themselves were intended to be confidential or were made to "facilitate the rendition of legal services," but whether Kroll was a privileged person when the communications were made or shared. If not, Kroll's interview questions and notes are not privileged from disclosure in the first instance, and any privilege otherwise attaching to documents shared with Kroll during its investigation has been waived by voluntary disclosure to a third party.[23]

Because UT does not contend Kroll or its investigators were lawyers performing legal services,[24] the critical inquiry is whether Kroll qualifies as "a lawyer's representative" under Rule 503, which sets out the basic parameters of the attorney–client privilege. Rule 503 defines "lawyer's representative" as "one employed by the lawyer to assist in the rendition of professional legal services."[25] As the party claiming the

---

[23] *See In re Grand Jury Proceedings*, 727 F.2d 1352, 1357 (4th Cir. 1984) ("It is [] the essence of the attorney–client privilege that it is limited to those communications which are intended to be confidential. 'The moment confidence ceases, . . . privilege ceases.'" (quoting *United States v. Tellier*, 255 F.2d 441, 447 (2d Cir. 1958))).

[24] *See* TEX. R. EVID. 503(a)(3) ("A 'lawyer' is a person authorized, or who the client reasonably believes is authorized, to practice law in any state or nation.").

[25] TEX. R. EVID. 503(a)(4)(A). A different standard applies to accountants, who will qualify as a "lawyer's representative" if their services are "reasonably necessary for the lawyer's rendition of professional legal services." TEX. R. EVID. 503(a)(4)(B).

privilege, UT bears the burden of proving Kroll satisfies Rule 503's requirements.[26]

The contract here was between two nonlawyers: UT and Kroll.[27] But even if Kroll had been directly employed by or on behalf of a lawyer, mere employment by a lawyer is not enough to qualify as a "lawyer's representative"; rather the engagement must be to assist a lawyer in acting as a lawyer. But how does one determine if the employment meets that standard? As all seem to agree, being "employed" "to assist" means the engagement serves the *purpose* of helping the lawyer provide professional legal services to the client. A "purpose" is "something set up as an object or end to be attained."[28] Here, the parties agree that, to qualify as a "lawyer's representative" under Rule 503, rendition of legal services by a lawyer to a client must be an objective of Kroll's engagement; however, they disagree about whether it must be the "primary" end game or merely one objective. In my book, one could not actually be "employed" "to assist" a lawyer in the relevant way unless helping a lawyer to provide legal services to a client is, at minimum, a

---

[26] *In re E.I. DuPont de Nemours & Co.*, 136 S.W.3d 218, 223 (Tex. 2004); *see City of Garland v. Dall. Morning News*, 22 S.W.3d 351, 364 (Tex. 2000) (the governmental entity seeking to avoid a request for disclosure bears the burden of proving the requested information is not subject to the PIA or is exempt from its disclosure requirements).

[27] *See supra* note 22.

[28] MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY, at 947 (10th edition 2000); *see* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY, at 1847 (2002) (defining "purpose" as "something that one sets before himself as an object to be attained: an end or aim to be kept in view in any plan, measure, exertion, or operation").

*significant purpose* for the consulting engagement.[29]  It also seems inarguable that "employed . . . to assist" requires something more than being *incidentally* helpful to legal counsel or useful in rendering legal services *as a matter of fact* or *after the fact*.  Were it otherwise, Rule 503's lawyer-representative definition would be impossibly broad.[30]  By holding that "assisting in the rendition of professional legal services must be a significant purpose for which the representative was hired in the first instance," the Court construes the rule as encompassing an appropriate constraint on its potential breadth.[31]  The problem, as I see it, is not the standard, but the Court's loose application of it to the record on appeal, which renders the narrow-construction mandate essentially tokenistic.

---

[29] *Accord In re Kellogg Brown & Root, Inc.*, 756 F.3d 754, 758-60 (D.C. Cir. 2014) (holding in-house counsel's internal investigation was covered by the attorney–client privilege "[s]o long as obtaining or providing legal advice was one of the significant purposes of the internal investigation . . . even if there were also other purposes for the investigation" and observing that this standard is essentially a "primary purpose test" without "draw[ing] a rigid distinction between a legal purpose on the one hand and a business purpose on the other"); RESTATEMENT, *supra* note 6, at § 72 cmt. c & illus. 2 ("A client must consult the lawyer for the purpose of obtaining legal assistance and not predominantly for another purpose. . . . Whether a purpose is significantly that of obtaining legal assistance or is for a nonlegal purpose depends upon the circumstances[.]"), Rptrs. note on cmt. c ("In general, American decisions agree that the privilege applies if one of the significant purposes of a client in communicating with a lawyer is that of obtaining legal assistance.").

[30] Surely the Uber driver who takes counsel from office to courthouse every day of a jury trial is—in the literal words of Rule 503—"employed by the lawyer to assist in the rendition of professional legal services."  *See* TEX. R. EVID. 503(4)(a).  Just as surely, however, confidential communications in the presence of said driver would waive the privilege because provision of professional legal services is not a *significant* purpose of transportation.

[31] *Ante* at 10.

What is most concerning about the Court's analysis is (1) the reliance on backward-looking, conclusory, and nonprobative affidavits from Sharphorn, former UT Chancellor William H. McRaven, and Assistant General Counsel Ana Vieira Ayala; and (2) the need to scavenge for clues in Kroll's 20-page engagement contract and 101-page final report to justify applying the privilege. The Court is forced to elevate unremarkable contract provisions to more significant status because the party claiming the privilege on the back-end failed to clarify on the front-end that assisting a lawyer in the rendition of professional legal services was an objective of the consultant's services, let alone a significant one.

When a client hires a lawyer or a lawyer hires a consultant, one could argue that at least a patina of privilege arises. But to extend the attorney–client privilege to an independent investigation by a nonlawyer independent contractor under a contract made directly with the client rather than with legal counsel, I would require much more clarity and certainty at the engagement level than the Court does.

**B**

As an independent contractor, Kroll was not an employee or agent of UT's general counsel nor under his control, so to invoke the privilege, some sort of contemporaneous substantiation of Kroll's role in the attorney–client relationship is vital. Requiring reasonably clear evidence that a nonlawyer consultant is conducting an internal audit or investigation to enable a legal professional to provide legal advice to a client is not an onerous standard. But here, there is neither competent

10

nor contemporaneous evidence that assisting UT's lawyers in the rendition of legal services was a purpose for Kroll's audit *at all*.

From my perspective, the minimum evidence that should be required to cloak such an internal investigation with attorney–client privilege is akin to the circumstances in *Harlandale Independent School District v. Cornyn*, a PIA case involving an attorney hired by a school district's general counsel to independently investigate a campus police officer's grievance.[32] The question was whether the attorney was acting as an attorney or in a different, nonlegal capacity.[33] In concluding that the attorney–client privilege applied to the investigation, the court of appeals noted that (1) the school district's general counsel informed the attorney at the time of hiring that she had been selected to analyze legal liability related to the grievance; (2) the attorney's retention letter not only charged her with a fact-finding mission but also specifically asked her to provide "legal analysis of the matters investigated," including "the legal liabilities and consequences facing the School District and Board of Trustees"; (3) the school district's superintendent testified that, at the time of hiring, both the attorney and the district's general counsel informed the superintendent that the attorney would be representing the school district "as an attorney"; and (4) consistent with what the engagement letter required, the attorney informed witnesses that she was acting as the school district's attorney.[34]

---

[32] 25 S.W.3d 328, 330, 333-34 (Tex. App.—Austin 2000, pet. denied).

[33] *Id.* at 332. UT's main cases—*Upjohn Co. v. United States*, 449 U.S. 383, 386-87 (1981), and *Kellogg Brown & Root*, 756 F.3d at 756—similarly involve attorney-led internal investigations.

[34] *Harlandale Indep. Sch. Dist.*, 25 S.W.3d at 333.

11

In stark contrast, UT's lengthy contract with Kroll doesn't even make a pretense of connecting Kroll's services with assisting with the rendition of professional legal services. The contract does not mention legal services, let alone require Kroll to provide or assist with the rendition of such services. The contract does not identify any lawyers who would be rendering legal services to UT nor any laws or regulations to help Kroll identify the facts relevant to the rendition of legal services.[35] The contract also does not mention the attorney–client or work-product confidentiality privileges nor advise or require Kroll to inform witnesses that it would be working for, with, or on behalf of UT's legal counsel. And there is no evidence that witnesses Kroll interviewed were ever informed that the external investigators were representing or assisting UT's legal department.[36] Likewise, although the "Scope of

---

[35] No competent lawyer would interview a witness or conduct a deposition without first determining what law governs compliance issues or the elements of a claim or defense. The only way to ensure that the facts necessary to formulate fruitful legal advice are developed by a nonlawyer consultant is to identify the facts that have to be proved or disproved.

[36] *Cf. Upjohn*, 449 U.S. at 394 (the Chairman of the Board gave "explicit instructions" that the "communications were 'highly confidential,'" and the employee questionnaire identified the investigator as "the company's General Counsel," "referred in its opening sentence to the possible illegality of payments such as the ones on which information was sought," and included a "statement of policy" that "clearly indicated the legal implications of the investigation"); *Kellogg Brown & Root*, 756 F.3d at 758 ("[H]ere as in *Upjohn* employees knew that the company's legal department was conducting an investigation of a sensitive nature and that the information they disclosed would be protected . . . [and were] told not to discuss their interviews 'without the specific advance authorization of KBR General Counsel.'").

Work" mentions protecting student privacy,[37] the immediately following paragraph discussing witness interviews says nothing about confidentiality.[38] The contract doesn't even take the simple step of parroting Rule 503's definition of a lawyer's representative. Nor has UT taken the basic step of producing evidence from the contract signatories—UT's Executive Vice Chancellor for Business Affairs (Dr. Scott C. Kelley) and a Senior Managing Director for Kroll (William C. Nugent)—about the contracting parties' understanding of Kroll's role.[39] Kroll's final report is no better on these fronts.

It's not enough that UT's legal counsel was tapped to help facilitate the investigation because in-house lawyers are routinely designated as contact persons for myriad nonlegal business activities and are routinely looped into or copied on nonlegal communications,

---

[37] "Student privacy must be fully protected. . . . Information provided to investigators in the course of the Work that could be used to identify a student and derived from FERPA Records will be protected accordingly, and will not be disclosed as part of the investigators' Final Report without the consent of the U.T. Austin General Counsel."

[38] "Interviews are to be conducted with relevant officials and staff from U.T. Austin, U.T. System Administration, the Board of Regents and others as deemed necessary. Current and former admissions staff who participated in the admissions process for the 2004 to 2013 entering classes will be included."

[39] No lawyer for UT signed the original engagement agreement. The agreement was later amended, in limited (and nonrelevant) part, four times during the course of the investigation. The original signatories, Dr. Kelley and Mr. Nugent signed each amendment. Three out of four of the amendments also bear the signature of a UT lawyer approving the particular amendment "as to content." The first amendment did not bear any UT lawyer's signature or include any such notation.

contracts, and notices.[40]  Nor is it sufficient that Kroll was generally admonished to keep all "Work Material" and "University Records" "confidential."  Both legal and nonlegal reasons exist for maintaining confidentiality during an audit—especially when the information is subject to the Family Educational Rights and Privacy Act (FERPA).[41]  Notably, the only confidentiality concerns *specifically* mentioned in Kroll's engagement contract had nothing whatsoever to do with the rendition of legal services.[42]

While the Court finds the contract's standard confidentiality provisions revelatory of Kroll's supposed role in assisting UT's lawyers,[43] I do not.  Paragraph 7 of the contract simply admonishes the contractor to "treat all Work Material as confidential."[44]  Paragraph 12.11, which

---

[40] *See United States v. Ruehle*, 583 F.3d 600, 608 n.8 (9th Cir. 2009) (noting that business advice does not fall within the purview of attorney–client privilege even if the advisor is a lawyer); *cf.* Tex. Att'y Gen. Op. No. JC-0233, at 3, 6 (2000) (opining that a closed-door executive session of a governmental body to discuss policy unrelated to legal matters was not permitted under the open-meetings statute's language merely because an attorney was present); *see also* Peter Tipps, *Confidentiality and Nondisclosure Agreements*, Practical Law Commercial Transactions: Practice Note at 4 (June 24, 2022) (noting that a company's legal department often plays a critical role in securing company-wide information and data protection).

[41] 20 U.S.C. § 1232g.

[42] *See infra* note 45.

[43] *See ante* at 11-12 & 19-20 n.10.

[44] Paragraph 7, titled "**Ownership and Use of Work Materials**," provides:

> All data, tapes, publications, statements, accounts, reports, studies, and other materials prepared by Contractor [Kroll] in connection with the Work (collectively, "**Work Material**"),

14

the Court seems to find particularly compelling, is relegated to the "Miscellaneous" provisions section of the contract and is equally banal in its imposition of confidentiality requirements.[45] I doubt anyone would

whether or not accepted or rejected by University, will be maintained as Confidential by Contractor. . . . The Work Material will not be used or published by Contractor or any other party unless expressly authorized by University in writing. Contractor [Kroll] will treat all Work Material as confidential.

[45] Paragraph 12.11, entitled "**Confidentiality and Safeguarding of University Records; Press Releases; Public Information**," states:

Under this Agreement, Contractor [Kroll] may (1) create, (2) receive from or on behalf of University, or (3) have access to, records or record systems (collectively, '**University Records**'). Among other things, University Records may contain social security numbers, credit card numbers, or data protected or made confidential or sensitive by Applicable Laws. Contractor . . . will use reasonable and appropriate measures to: (1) hold University Records in confidence and will not use or disclose University Records except as (a) permitted or required by this Agreement, (b) required by Applicable Laws, or (c) otherwise authorized by the University in writing; (2) safeguard University Records according to reasonable administrative, physical and technical standards that comply with each of the following requirements:

12.11.1 **Notice of Impermissible Use.** [Requiring Contractor to give "prompt and reasonable" notice if an impermissible use or disclosure of University Records occurs].

12.11.2 **Return of University Records.** [Generally requiring Contractor to return University Records if requested by the University].

12.11.3 **Disclosure.** [Requiring Contractor to "require any subcontractor or agent to comply with the same restrictions" and prohibiting disclosure of University Records to a subcontractor without the University's permission].

genuinely view these provisions as anything other than ordinary confidentiality provisions typical of consulting contracts of any nature. As a matter of fact, even UT's "Contract Management Handbook" describes the contract terms in Paragraphs 7 and 12.11 to be "routine," "standard," "generally accepted," "recommended," and "essential."[46] The question here is not whether the parties expected information to be kept confidential, but whether Kroll was a privileged person under the Texas Rules of Evidence when confidences were shared. Nothing in the confidentiality provisions speaks to that matter one way or the other. But not a single word in these provisions speaks to the performance of

---

> 12.11.4 **Press Releases.** [Prohibiting Contractor from making any public statements about the project or engagement without the University's prior written approval].
>
> 12.11.5 **Public Information.** [Requiring Contractor to make any information created or exchanged with the University available to the University on request and as needed to enable the University to comply with the PIA].
>
> 12.11.6 **Termination.** [Authorizing the University to terminate the Contract if this paragraph is breached].
>
> 12.11.7 **Duration.** [Stating Paragraph 12 survives expiration or termination of the Agreement].

Unlike Paragraph 7, this provision specifies certain categories of information as implicating confidentiality concerns. Given that specificity, the failure to include any reference to attorney–client confidences or privileges is edifying.

[46] The University of Texas at Austin, *Contract Management Handbook*, at 62-63 (October 13, 2017), https://utexas.app.box.com/v/ut-austin-cont-mgmt-hdbk (last visited June 21, 2023) (including provisions governing "Ownership and Use of Work Material" and "Confidentiality and Safeguarding of University Records; Press Releases; Public Information" as among those that are "routine," "standard," and may be "essential" depending on the contract's subject matter).

16

legal services, attorney–client confidences, or privileges as one might expect if assisting in the rendition of legal services was a *significant purpose* of the engagement.

The Court also highlights a contract provision requiring Kroll "to promptly inform the University of any requests or subpoenas related to project information 'so that [UT] may seek from a court of competent jurisdiction a protective order or other appropriate remedy to limit the disclosure.'"[47]  Again, this is a typical contract provision one might find when a consultant has access to or possession of information belonging to either the client or to someone to whom the client owes a duty of confidentiality.  Given Kroll's access to FERPA-protected information, it's unsurprising that this provision imposes a notification obligation on UT's contractor that enables UT to comply with its corresponding notification obligation under the university's FERPA policy.[48]  Such provisions are so typical that similar notification provisions are also found in other UT contract templates that have nothing to do with legal services.[49]

---

[47] *Ante* at 19-20 n.10 (quoting Paragraph 9 of the Kroll Contract, titled "**Information Requests or Subpoenas**").

[48] UT's FERPA policy states that "[i]nformation concerning a Student shall be released in response to a judicial order or lawfully issued subpoena" but UT must "make reasonable efforts to notify the Student of an order or subpoena before complying with it[.]"  The University of Texas System, General Counsel Documents, https://www.utsystem.edu/offices/general-counsel/document-library (FERPA Policy, at paragraph C(2)(b)(x)) (last visited June 21, 2023).

[49] *See, e.g.*, *id.* (various nondisclosure agreements); *see also* Tipps, *supra* note 40 ("Confidentiality agreements usually allow the recipient to disclose confidential information if required by court order or other legal process.  The recipient usually has to notify the disclosing party of this order (if legally

Vaguely charging Kroll with ascertaining whether UT's admission's process is "beyond reproach" is no better because that is an ideal, not a legal standard.[50] The Court does a deep dive into dictionary definitions to assure us that legal compliance falls within the broad ambit of actions that are "beyond reproach."[51] But if assisting a lawyer in the rendition of legal services were actually a *significant purpose* of a nonlawyer's consulting agreement, a "greater includes the lesser" analysis would not be required to make that deduction. Such important objectives are rarely accomplished through vague terms and subtle

---

permitted to do so) and cooperate with the disclosing party to obtain a protective order.").

[50] In defining "beyond reproach," Kroll's contract says: "Specifically, the investigation should determine if U.T. Austin admissions decisions are made for any reason other than an applicant's individual merit as measured by academic achievement and officially established personal holistic attributes, and if not, why not." No legal authority was identified as bearing on this inquiry. To the contrary, "[t]his charge" was based solely on the aspirational "premise that applicants should only be admitted to a public university based on their individual merit, i.e., academic achievement and officially established personal holistic factors" and "should not gain advantage only because they are recommended outside the prescribed admissions process by an influential individual." Kroll was asked to "identif[y]" "[a]ny competing evidence or premise as to the basis for admissions," not so that UT's legal counsel could provide legal advice, but "so it can be openly debated."

The "Scope of Work" appended to the engagement contract further advised that Kroll "should" "promptly convey[] to the U.T. System General Counsel" any "serious concern" "about a particular recommendation or other conduct of an individual outside U.T. [that] is brought to light . . . such as evidence of a quid pro quo or a threat from a recommender[.]" While the Court finds this statement particularly illuminating, *see ante* at 18, I do not. This is a run-of-the-mill request to an auditor to alert the client's legal representative of any concerns; it can hardly be characterized as supporting the conclusion that assisting legal counsel was a significant, as opposed to incidental, objective of the engagement.

[51] *Id.* at 18-19 & n.8.

18

devices. In fact, lawyers and law firms engaging consultants to help with legal matters routinely make the nature of such engagements abundantly clear in letters of a few pages. It's not that hard. But to guard against abuse of the privilege, it is that important.

UT officials are sophisticated enough that they would have known about the importance of safeguarding the privilege if that had been their intent.[52] This point is amply demonstrated by the "Outside Counsel Contract" template the Attorney General mandates for state agencies, including university systems. This template, which is readily available on the UT General Counsel website, includes recitations like:

> **Whereas**, Agency requires the assistance of outside legal counsel in carrying out its responsibilities; and
>
> **Whereas**, Agency has received prior approval from the [Office of the Attorney General] to contract for outside legal services; and
>
> **Whereas**, Outside Counsel desires to provide legal services to Agency . . . .[53]

---

[52] Interestingly, a PowerPoint presentation prepared by UT's Office of General Counsel addressing "Scope of Work Issues" states that, in drafting the scope of work for a contract, it should be made "**absolutely clear** what contractor is supposed to provide or perform." UT General Counsel Documents, https://www.utsystem.edu/offices/general-counsel/document-library (Scope of Work Issues) (emphasis in original) (last visited June 21, 2023).

[53] UT General Counsel Documents, https://www.utsystem.edu/offices/general-counsel/document-library (Outside Counsel Contract Example FY22-FY23) (last visited June 21, 2023); *accord* Memorandum from Off. of the Att'y Gen.–Gen. Couns. Div. to State Agencies, at 20-21, Univ. Sys., & Insts. of Higher Educ., at 20 (April 2, 2012), https://www2.texasattorneygeneral.gov/files/agency/agency_packet.pdf (Outside Counsel Contract Template) (last visited June 21, 2023).

19

The template also goes beyond generalized "confidentiality" mandates and specifically requires outside counsel to:

> exercise professional judgment and care when creating documents or other media intended to be confidential or privileged attorney–client communications that may be subject to disclosure under the [PIA] . . . [and] mark confidential or privileged attorney–client communications as confidential.

UT is required to include these provisions in its engagement contract when hiring *a lawyer*. It should not be too much to ask for something—anything—in a contract between a client and a nonlawyer consultant that at least hints at a connection with the provision of legal services. Indeed, one might expect that a *lay person* assisting legal counsel would need to be contemporaneously advised about applicable privileges, especially one as important as the attorney–client privilege. While UT undoubtedly wanted to keep information about its admissions practices confidential—and was legally obligated to keep its students' information confidential—mere imposition of "confidentiality" obligations on a nonlawyer consultant is, at best, equivocal with respect to the nature of the consultant's role.

By the same token, Kroll's investigation may have been useful, or subsequently used, in securing or facilitating legal advice from UT's lawyers. But because the requisite relationship must exist when the communications are made or shared, the privilege inquiry cannot be backward-looking. In that regard, the affidavits the Court views as

20

"confirming" Kroll's status as a "lawyer's representative" are facially inadequate to support that conclusion.[54]

Ayala's affidavit does not speak to the nature of Kroll's representation and is otherwise conclusory in all material respects. With regard to Kroll, Ayala's affidavit merely repeats what Kroll's contract and report say. The Court implies there is more substance to the affidavit by charging this opinion with "downplay[ing] [its] specificity and detail."[55] Yet the Court conspicuously fails to identify anything at all in Ayala's affidavit that substantiates UT's claim that Kroll was employed to assist UT's legal counsel in providing professional legal services. In lieu of doing so, the Court complains that it would "undermine the very essence of the privilege" to expect the party with the burden of proof to provide facts relevant to the nature of the engagement. I beg to differ. As the Court concedes,[56] the inquiry here

---

[54] *See ante* at 16, 22.

[55] *See id.* at 21-22 n.11. The Court finds sufficient specificity in Ayala's affidavit because it "discusses specific numbered documents in the privilege log, including names of individuals involved and the purpose of those documents." *Id.* While it's true that the privilege log names many individuals, it does not identify a single Kroll employee by name, so it's difficult to see how the naming of individuals adds any *material* substance to Ayala's affidavit. Though the Court implies otherwise, "Kroll" barely even makes an appearance in the privilege log. Indeed, there are only two categories of documents of "[u]nknown" or "[v]arious" date that are broadly labeled as having been authored by "Kroll": one with documents described as "[t]yped and handwritten notes of interviews by Kroll" and the other with documents described as "[q]uestions asked of UT Austin clients during interviews." Whether those documents are, in fact, privileged is the ultimate legal issue in dispute.

[56] *See id.* at 9-10 (observing that the privilege is either waived or does not attach to confidential information shared with Kroll unless Kroll qualifies as a "lawyer's representative"); *id.* at 16 (citing "the formation of the

21

is not whether confidential information was exchanged but whether Kroll fell within the scope of the privilege when it was. I fail to see how facts bearing on that inquiry would "undermine the very essence of the privilege." What undermines the privilege is sharing confidential information with someone who is not covered by the privilege.

Sharphorn's affidavit also adds nothing from an evidentiary perspective because it merely quotes from and paraphrases the "Scope of Work" appended to Kroll's contract. More notable is the affidavit's utter silence about having retained Kroll "to assist" UT's lawyers.[57] Instead, the affidavit states that after Sharphorn's own investigation proved ineffective, Kroll was hired "to conduct an independent investigation." The absence of any evidence that Kroll ever provided its report to Sharphorn or to the UT Office of General Counsel is just as noteworthy.

---

relationship and the purpose of Kroll's engagement at the time of employment" as the focus of the inquiry into the relationship between UT and Kroll).

[57] Sharphorn's affidavit was prepared in connection with other litigation that arose after Kroll issued its report. That dispute did not concern the nature of Kroll's engagement, so it's unsurprising that Sharphorn's affidavit was not focused on the material inquiry here: whether Kroll was employed to assist UT lawyers in the rendition of professional legal services. The affidavit regurgitates some of the engagement-contract provisions but provides no facts to corroborate that Kroll was employed as a lawyer's representative when the communications at issue were made. Sharphorn's affidavit shows that legal counsel found the report useful in other litigation, but hindsight is not the relevant inquiry. In erroneously describing this opinion as "criticiz[ing] Sharphorn's affidavit because it 'was prepared in connection with other litigation,'" *id.* at 22 n.12, the Court misses the point. It's true, as the Court says, that affidavits are often prepared after the fact for purposes of litigation, and it's true that affidavit testimony is still testimony even if given in other litigation. But it's not the source of the testimony that's problematic here; it's that Sharphorn's affidavit lacks probative value beyond reciting portions of Kroll's contract.

Most puzzling is the Court's suggestion that McRaven's affidavit is probative of the relevant inquiry.[58] McRaven's affidavit doesn't attest to any facts that corroborate the purpose of Kroll's independent audit contemporaneous with the communications at issue. And it couldn't because, as the affidavit affirmatively establishes, McRaven was not employed at UT until long after Kroll was hired and mere weeks before Kroll submitted its final report to him. If McRaven's affidavit is probative of anything, it's that Kroll was assisting and advising UT, not Sharphorn. To that point, McRaven's affidavit states that (1) Kroll presented its report to McRaven, not Sharphorn; (2) after reading the report several times, McRaven contacted Sharphorn for legal advice, not the other way around; and (3) McRaven acted on Kroll's conclusions and advice, not Sharphorn's.[59]

Sharphorn's affidavit confirms the same:

On February 6, 2015, Kroll presented its Final Report to the Office of the Chancellor of the University of Texas[.] . . . William H. McRaven, who began his service as Chancellor of the UT System in January 2015[,] received and reviewed the results of the Kroll Report. On February 9, 2015,

---

[58] *Id.* at 15-16 & 22.

[59] McRaven averred:

On February 6, 2015, Kroll presented me its final report . . . . After receiving it, I read the Kroll report several times. In addition, I spoke with Vice Chancellor and General Counsel Dan Sharphorn, from whom I sought legal advice. . . . After careful review and consideration, on February 9, 2015, I sent a letter to the Board of Regents rendering my decision that then-UT Austin President Bill Powers would not be subject to disciplinary action because Kroll reported that there was no violation of law, rule, or policy, and I, therefore, determined that his conduct did not rise to the level of willful misconduct or criminal activity.

> Chancellor McRaven sent a letter to the Board of Regents for the UT System rendering his decision that then-UT Austin President Bill Powers would not be subject to disciplinary action because Kroll reported there was no violation of law, rule, or policy, and the Chancellor determined that his conduct did not rise to the level of willful misconduct or criminal activity.

None of these affidavits sheds any light on the issue presented: whether Kroll was employed to assist UT's lawyers in the rendition of legal advice.

Indeed, nothing in the Kroll Report, the engagement contract, or the affidavits supports the Court's conclusion that Kroll was engaged to provide information *to Sharphorn or any other UT lawyer* so that *those lawyers* could provide legal advice to UT. To the contrary, the Kroll Report on its face—and as it was actually used—shows it to be an end in itself, not a means to an end.

Even aggregating the equivocal clues the Court finds sufficient, the connection between Kroll's audit and the rendition of legal services by UT's legal counsel is too tenuous to be rationally inferable.[60] None of the language in Kroll's engagement contract with UT even remotely distinguishes it from any other that a client might make with a

---

[60] *See In re E.I. DuPont de Nemours & Co.*, 136 S.W.3d 218, 223 (Tex. 2004) (holding that if a party asserting privilege tenders documents to the trial court and makes a prima facie showing of privilege—meaning "the minimum quantum of evidence necessary to support a rational inference that the allegation of fact is true"—the trial court must conduct an in camera inspection of those documents to determine whether that party has met its burden of proof (quoting *Tex. Tech Univ. Health Scis. Ctr. v. Apodaca*, 876 S.W.2d 402, 407 (Tex. App.—El Paso 1994, writ denied))).

nonlawyer consultant.[61] While magic words aren't required, the absence of any that might reasonably be expected if assisting the rendition of legal services was a *significant purpose* of the audit is telling.[62]

\* \* \* \* \* \*

A proper constraint on the scope of the attorney–client privilege requires courts to distinguish between a consultant engaged to assist a lawyer and a consultant engaged to assist the client. From my perspective, the Court's application of the attorney–client privilege overextends the privilege and, in doing so, practically invites misuse. Bearing in mind the opposing—but equally compelling—interests at stake, I would take a more restricted view of what it means to be

---

[61] One could easily envision a contract between UT and an information-technology consultant auditing the university's data-processing systems that:

- admonishes the consultant to maintain its Work Materials as confidential;

- admonishes the consultant to maintain University Records as confidential;

- requires the consultant to notify the university if it receives a subpoena or other judicial process seeking information belonging to the University or its students;

- charges the consultant with determining if university systems are operating "beyond reproach"; and

- asking the consultant to notify counsel if it has any "serious concerns."

The Court's insistence on imbuing such common contract provisions with more significant meaning sets a troubling precedent.

[62] By selectively quoting from this opinion, the Court incorrectly portrays it as requiring consulting agreements to use certain language or "magic words." *See ante* at 19-20 n.10.

"employed . . . to assist in the rendition of professional legal services."[63] While I fully appreciate that the complexities of modern business and legal practices often necessitate consulting with third-party experts to properly advise a legal client or prepare for litigation, when an engagement contract is between the client and an independent nonlawyer consultant, the connection between the consultant's services and the rendition of legal advice should not be left to the imagination or open to debate.

Placing the burden of proof where it properly lies, I would hold that the attorney–client privilege does not apply to documents Kroll created or reviewed in connection with its audit of UT's admission processes because UT failed to show that Kroll—a nonlawyer independent contractor—was "employed . . . to assist [UT's attorneys] in the rendition of professional legal services."[64]  Because the Court allows UT to conceal documents that must be disclosed under the PIA, I respectfully dissent.

John P. Devine
Justice

**OPINION FILED:** June 30, 2023

---

[63] *See* TEX. R. EVID. 503(a)(4)(A).

[64] *See id.*